**TRANS WORLD AIRLINES, INC.,**
Plaintiff-Appellant,

v.

**Howard R. HUGHES, Defendant,**
and
**Hughes Tool Company and Raymond M.**
**Holliday, Defendants-Appellants.**

Nos. 883, 834, Dockets 34902, 35114.

United States Court of Appeals,
Second Circuit.

Argued May 7, 1971.

Decided Sept. 1, 1971.

See also D.C., 314 F.Supp. 94.

James V. Hayes, New York City (Ralstone R. Irvine, Mahlon F. Perkins, Jr., New York City, David A. Wier, of counsel; Donovan, Leisure, Newton & Irvine, Davis & Cox, New York City, on the brief), for defendants-appellants.

Dudley B. Tenney, New York City (Paul W. Williams, Immanuel Kohn, Marshall H. Cox, Jr., Abraham P. Ordover, Lawrence C. Browne, Michael P. Tierney, New York City of counsel; Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, on the brief), for plaintiff-appellant.

Before SMITH, KAUFMAN and HAYS, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We are presented in this case with cross-appeals from a final judgment entered April 14, 1970, premised upon a previous default judgment, in favor of plaintiff Trans World Airlines, Inc. (TWA) against defendants-appellants Hughes Tool Company and its chief financial officer, Raymond M. Holliday (Toolco), which, the district court tells us, 312 F.Supp. 478, at 480, is some thirty times greater than the next highest monetary award ever entered.

The extraordinary aspect of this complex litigation is in large measure attributable to the elusiveness of Howard R. Hughes, progenitor and sole owner of Toolco, protagonist in its operations, in a sense the central character of this litigation as well, and yet not a party to this appeal because Hughes himself, although named as a defendant in TWA's complaint, could not be located for service of process.

## I.

Since the facts in this litigation have been set forth in detail in many prior reported decisions, see 214 F.Supp. 106 (S.D.N.Y.1963), 32 F.R.D. 604 (S.D.N.Y. 1963); 332 F.2d 602 (2d Cir. 1964); 38 F.R.D. 499 (S.D.N.Y.1965); 308 F.Supp. 679 (S.D.N.Y.1969); 312 F.Supp. 478 (S.D.N.Y.1970), in the interest of avoiding unconscionable length of this opinion, we will limit our own initial statement to a brief resume of the tortuous history of the case, sufficient to permit a meaningful statement of the issues raised.

More than a decade ago, by a complaint dated June 30, 1961, TWA filed its complaint in this action charging Toolco and Hughes with violations of the Clayton and Sherman Acts, 15 U.S.C. §§ 1, 2, 11, and 18, as well as with a claim, for which pendent jurisdiction was asserted, alleging malicious and willful injury to the business of TWA.

Convoluted and protracted pre-trial maneuvers culminated in the failure of Toolco to produce Hughes for a deposition scheduled by court order to be taken on February 11, 1963. As a result of Hughes's confessed unwillingness to appear, as well as the nonproduction by Toolco of certain papers and documents whose disclosure to plaintiff had also been required by court order, the Rule 2 judge assigned to the action (Rule 2, General Rules for the Southern and Eastern Districts of New York), Judge Metzner, on May 3, 1963 filed two orders. One entered the default against Toolco and granted TWA's motion to increase the *ad damnum* clause of its complaint from $105,000,000 to $135,000,000, after trebling. In the second order Judge Metzner also found Toolco in default with respect to five counterclaims that Toolco had asserted against TWA and several additional defendants. Judge Metzner dismissed these counterclaims and also granted TWA's motion for summary judgment on a sixth counterclaim.

We granted leave to take an interlocutory appeal from the former order, after Judge Metzner had certified that an appeal was appropriate under 28 U.S.C. § 1292(b). But we limited our review to considering whether the district court's jurisdiction over the antitrust action was ousted because primary jurisdiction lay with the Civil Aeronautics

Board, which had approved various steps by which Toolco gradually assumed virtually complete control of TWA, holding about 78% of its stock at the time the complaint was filed, and whether certain of the CAB orders associated with those grants of approval constituted a good defense to TWA's action. The interlocutory appeal was consolidated with defendants' parallel appeal as of right from Judge Metzner's dismissal of the counterclaims. A panel of this court ultimately ruled that the district court did properly assert its jurisdiction and that the CAB orders did not constitute blanket approval of the claims in the complaint and hence were not a defense to TWA's action. In the appeal on the counterclaims, the orders of the district court were affirmed with one exception, not relevant here (determining that the CAB had exclusive jurisdiction over one of the dismissed counterclaims). 332 F.2d 602, cert. granted, 379 U.S. 912, 85 S.Ct. 261, 265, 13 L.Ed.2d 184 (1964), cert. dismissed as improvidently granted, 380 U.S. 248, 249, 85 S.Ct. 934, 13 L.Ed.2d 817, 818 (1965).

Judge Metzner's ruling adjudging Toolco in default necessitated an extensive hearing to determine damages. Herbert Brownell, Esq.,[1] appointed Special Master for this purpose, conducted hearings between May 2, 1966, and April 9, 1968. On September 1, 1968, in a thorough report, the Master awarded TWA trebled damages of $137,611,435.95. Both sides filed objections. On December 23, 1969, Judge Metzner adopted Brownell's report in all respects, 308 F. Supp. 679, and then in a subsequent opinion awarded attorneys fees of $7.5 million and assessed costs in the amount of $336,705.12. 312 F.Supp. 478. On April 14, 1970, the district court entered its final judgment, with 6% interest to run from that date, in the sum—impressive

even by space age and inflationary standards—of $145,448,141.07.[2]

## II.

### A. Toolco Appeal

The first thrust of the Toolco appeal is directed at the default judgment itself and primarily concerns issues that were not the focus of the damage hearing before Special Master Brownell. The broad question pressed by Toolco is whether TWA is entitled to recover any amount whatever on the record before us, regardless of the adequacy of its proof of damages. Toolco contends (discussed in part III below) that the default judgment was improperly entered against it, in violation of its due process rights, and should be vacated; that (part IV) even if the default judgment is valid, the judgment does not justify assessing damages against Toolco for any antitrust violations, since in Toolco's view the evidence in the record conclusively refutes the possibility that any such violations could have occurred; and that (part V) even if the default judgment establishes antitrust infractions, TWA has not proved that any damages it might have suffered as a result of acts of mismanagement alleged in the complaint arose from antitrust violations. On each of these questions, we affirm the judgment below in all respects.

Toolco also contests Special Master Brownell's calculations of the damages. It argues that (part VI), even if proximate causation was shown, the damages were in several respects wrongly computed. In each of these respects we also affirm the reasoning and conclusions of the Master and of Judge Metzner.

Additionally, Toolco challenges under F.R.Civ.P. 54(c) Judge Metzner's grant of TWA's motion to increase the ad damnum at the same time he entered

---

1. Hon. J. Lee Rankin, appointed Special Master during pre-trial proceedings, was replaced when he resigned in December 1965 to become Corporation Counsel for New York City.

2. A prayer for equitable relief included in the original complaint was mooted when Toolco sold all its TWA stock in May, 1966.

the default judgment (part VIII). It also argues that the award of attorney's fees is excessive and unreasonable (part IX). We believe Judge Metzner properly permitted TWA to raise the *ad damnum* and that the payment allowed for legal services was within the bounds of his discretion.

### B. *TWA Appeal*

TWA takes issue with only one item of Brownell's report, *viz.* certain interest charges credited in mitigation of damages (part X). We affirm the Master's disposition of this issue. TWA also appeals from the denial by Judge Metzner of moratory interest as an element of the damages to be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15. It also questions Judge Metzner's holding that interest on the judgment should run from the date of the district court's judgment, rather than the date the Special Master filed his report, and contests the award of only 6% interest pursuant to New York judgments law, instead of the 7½% currently set by the state Banking Board as the maximum allowable commercial rate. We discuss these issues in part XI and affirm the district court on the first two points, but hold that proper interest under current New York decisional authority is 7½%. TWA's last assertion (part XII) is that it may recover $1.6 million compensation for fees paid to experts as a component of its "cost of suit," 15 U.S.C. § 15. With this assertion we disagree.

### III.

Toolco argues forcefully that Judge Metzner's entry of a default judgment having such drastic consequences resulted in a denial of due process and was otherwise an abuse of discretion under F.R.Civ.P. 37(b) (2) (iii) and 37 (d). We are reminded not only of the severe nature of this particular default, but of the fundamental importance of the right to an adversary hearing prior to judicial determination of rights and liabilities. We are in full accord with the general proposition, for which Toolco cites the three leading cases of Hovey v. Elliott, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897), Hammond Packing Co. v. Arkansas, 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909), and Societe Internationale v. Rogers, 357 U.S. 197, 78 S. Ct. 1087, 2 L.Ed.2d 1255 (1958), that the totality of circumstances surrounding the failure to make discovery must be considered in determining what sanctions to apply under Rule 37. As we understand Toolco's argument, those portions of the "totality of circumstances" it considers to control the invalidity of the default here are these: that TWA did not itself comply with Toolco's efforts to pursue pre-trial discovery sufficiently to lay an adequate foundation for the attempt to depose Howard Hughes; that, to similar legal effect, Judge Metzner on January 10, 1963, improperly denied Toolco's request for a Rule 16 hearing and permitted TWA to delay answering interrogatories served on it by Toolco in the fall of 1962 until after the Hughes deposition scheduled for February 11, 1963; that its own compliance with TWA's requests for discovery was substantial and in good faith; and that TWA did not and indeed could never have shown a need to depose Hughes. In sum it argues that in the face of all this, the district court grossly abused its discretion in not resorting to a less drastic alternative remedy before putting an end to litigation on the merits with a default judgment.

Although we agree with TWA that these arguments are unpersuasive, for the sake of clarity we pause to reject TWA's alternative theory that we may not consider the merits of the default judgment because we are required by either res judicata or collateral estoppel to follow the affirmance by the earlier panel of this court of the default judgment entered against Toolco on its counterclaims. Res judicata is singularly inappropriate in this context. As we have noted, leave to Toolco to appeal from the default judgment entered on TWA's antitrust complaint was narrowly con-

fined and the panel expressly reserved the very question at issue here, "[t]he propriety of the court's entering a default judgment against the defendants with respect to the complaint * * *." Prior to the judgment now appealed from, there had simply been no "final judgment" entered with respect to the merits of TWA's cause of action against Toolco, and thus we lack the fundamental prerequisite for applying res judicata. See Moore, Federal Practice ¶ 0.405[1].

■■■ Nor will collateral estoppel avail TWA. The relevant issue "actually litigated and determined in the prior" appeal, Lawlor v. National Screen Service Corp., 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122 (1955), was only that Judge Metzner properly entered the default on Toolco's counterclaims. This is a sharply distinguishable issue from the propriety of a different default judgment in favor of Toolco's adversary (this does not follow, as Toolco suggests, because the latter default is more drastic, but simply because the two questions are not the same). The issue of the propriety of the default here is not a right, question, or fact determined on the previous appeal. We believe we can fairly assume that TWA would not attempt to invoke collateral estoppel if the counterclaim had been asserted in a separate action. Combining two claims for trial as permitted for convenience under the Federal Rules does not dissolve the separate identities of the two claims or the two default judgments. Collateral estoppel and res judicata take aim at redundant litigation of identical issues or causes of action; they are not intended to foreclose consideration of the legal merits by analogy—however persuasive the analogies may be.

This is not to say that we will entirely disregard the obvious force of the prior determination on so closely related a question. This is foremost a matter of *stare decisis* and, of course, we *are* bound by collateral estoppel not to reopen subsidiary issues actually determined in the earlier appeal. We are persuaded that the most important consid-erations that prompted the earlier affirmance of the default on Toolco's counterclaims compel the same result here.

The essential details of the pre-trial proceedings that climaxed in the default are succinctly set out in Chief Judge Lumbard's earlier opinion, 332 F.2d 602, and we will endeavor to avoid unnecessary repetition. Because the factors bearing on the two default judgments are not identical, however, and in view of Toolco's attack on the district court's conduct of the pretrial proceedings, we cannot entirely avoid a brief sketch of the history of the litigation prior to the default.

One relatively minor justification put forward by the earlier panel in affirming the default judgment on the counterclaims related to Toolco's noncompliance with two discovery orders entered upon motions made by certain defendants who had been joined in the litigation by Toolco's counterclaim. Toolco now asserts that these production orders concerned matters irrelevant or at least of marginal importance to TWA's complaint. However this may be—and it is virtually impossible, because of the default and the nonproduction of the documents to evaluate this claim—we agree that the failure to comply with orders granted in favor of the other litigants would most likely not in itself have warranted the severe remedy of a default judgment in favor of TWA on the principal action.

But it is also apparent that these production orders are of trivial importance to the propriety of the default judgment in question here, in light of Howard Hughes's deliberate, knowing, wilful, and plainly announced refusal to comply with an order requiring his appearance for the taking of his deposition on February 11, 1963, and which had been served long in advance of the return day. The reason that entry of the default was inevitable after Hughes's nonappearance can only be understood against the background of TWA's intensive efforts, first undertaken on the very day that it filed its complaint, to compel Hughes's personal testimony, as a witness and "man-

aging agent" of defendant Hughes Tool Co. under F.R.Civ.P. 37(b) (2). TWA has consistently maintained, and continues to do so, that quite aside from the fact that he was Toolco's alter ego, Hughes's pretrial testimony was absolutely essential for it adequately to frame the issues and prepare for trial because of Hughes's extraordinary secretive methods of doing business. It was the indispensable nature of Hughes's personal testimony, according to TWA, that prompted its diligent pursuit of Hughes from the inception of the litigation. TWA's campaign to depose Hughes, which opened with a motion for leave to do so on the date it filed its complaint, was temporarily frustrated when the motion was denied and Toolco was granted priority in the taking of depositions. But TWA renewed its effort with a further unsuccessful motion and proposals to depose Hughes prior to Toolco's depositions. In early January, 1962, TWA adopted a new tactic and repeatedly sought with equal lack of success, to discover Hughes's whereabouts from Toolco. After further futile notices to depose Hughes served in January and February, 1962, TWA achieved a breakthrough when on June 4 the then Special Master rejected Toolco's objections to interrogatories directed to both Hughes and Toolco to locate Hughes so that he might be deposed. Toolco was ordered to answer the interrogatories unless Hughes should authorize counsel to accept service of a subpoena on his behalf for his appearance at the deposition.

On appeal the district court ordered that the interrogatories be answered as modified by it in an immaterial respect. Counsel for Toolco on July 27 informed the Master that Hughes had authorized counsel to accept service of a subpoena for Hughes to appear as a witness. An extended period of wrangling followed. Among other highlights of this period, Toolco refused a proposed stipulation and order to serve Hughes through Toolco's counsel, on the ground that agreeing to the stipulation might prejudice its right to object to the propriety of the deposition. Finally, on September 6, 1962, the same day that TWA charged that a purported authorization for counsel to accept service for Hughes was apparently a forgery, counsel for Toolco informed Judge Metzner that another lawyer, Chester Davis, had in fact been served that day in California, pursuant to Hughes's personal authorization. On September 13, as part of its indignant response to the forgery allegation, Toolco submitted to the court the notice of deposition, a subpoena to Hughes, an affidavit of Davis stating his authority to accept service for Hughes, and a second affidavit from a Los Angeles notary stating that Hughes had indeed appeared in person before him and had acknowledged Davis's authority.

Subsequently, the district court adopted a decision of Special Master Rankin that Toolco would bear responsibility for Hughes's response to the subpoena, and stated that Hughes would be considered bound by this declaration unless he objected. No objections were ever made and there is, of course, no question that Toolco was responsible for the actions of the owner of all its stock. At Toolco's instance, the deposition date was twice postponed until by order of January 10, 1963, the court affirmed a final date set by Master Rankin requiring Hughes's appearance on February 11, a schedule "to be adhered to in the absence of extraordinary circumstances." Also on January 10, 1963, Judge Metzner denied an application for a Rule 16 pretrial hearing that had been presented to it by Toolco on September 25, 1962, at the initial suggestion not of Toolco but of the Master. The motion was denied "without prejudice to renew on papers before the Court 30 days after the completion of the deposition of Howard R. Hughes." Judge Metzner also affirmed the denial by the Special Master of Toolco's motion to depose two financial institutions concerned primarily with issues raised by Toolco's counterclaim, the Irving Trust Co. and Dillon, Reed, & Co., on the ground that to grant the mo-

tion would interfere with the scheduled deposition of Howard Hughes.

Thus by mid-January Toolco had explored and exhausted myriad possible avenues for further delaying the day of reckoning. On February 8, 1963, the Friday prior to Hughes's scheduled appearance the following Monday, Toolco announced a strategy decision. That day Toolco's counsel served on TWA and filed with the court a "notice of position" stating that in view of the court's denial of its motion two days earlier to dismiss the complaint, the denial of a certification permitting review of that order under 28 U.S.C. § 1292(b), and because of "the enormous expenses which would be incurred by Toolco * * * in further pre-trial *and trial* proceedings and the belief of Toolco *that such expenses would exceed the amount of damages provable by plaintiff under the complaint*" (emphasis added) Toolco "elects, subject only to whatever judicial relief it may hereafter obtain, to rest on the merits of its positions as heretofore taken so that it may avoid the burdens and expenses involved in further pre-trial *and trial* proceedings prior to the time that an appellate court has the opportunity to rule upon the decisions and orders heretofore made herein" (emphasis added).

At a hearing conducted February 8, 1963, Toolco's counsel, Davis, whose signature appeared on the "notice of position," admitted that "the subpoena on behalf of Mr. Hughes was valid, never was questioned." He also read from the record that portion of a ruling by the Special Master on September 15, 1962, imposing responsibility for Hughes's actions on Toolco, including the Master's comment that "I am piercing the corporate veil as to the Hughes Tool Company, and I am bringing what I hope is clear notice of very substantial sanctions" against Toolco "in case there should be at some later date a * * * failure to respond to the subpoena * * *." Davis commented that Toolco was "aware of these rulings" and had accepted the responsibility imposed on it by the Master.

Davis further explained that he had described to Toolco the sanctions available in the event Hughes should not appear, with particular regard to F.R.Civ.P. 37 (d). Davis further explained that the basis of Toolco's strategic judgment was that which had been expressed in the "notice", a calculation that TWA could not prove damages equal to the expenses of further litigation. Finally, Davis candidly and clearly recognized, and attributed the same awareness to Toolco, "that by insisting on a right to obtain a review on the legal questions which have been decided to date, and should it develop that they are in error * * * as a consequence *they may be deprived of further defending on the merits, other than on the question of damages*" (emphasis added). Davis described Toolco's decision to stand on Hughes's nonappearance as a "business decision"—the wisdom of which Davis himself pointedly would not vouch for—and responded affirmatively to the court's query whether Toolco's position was that "the plaintiff may take whatever proceedings it is advised to take by way of sanctions under Rule 37."

Short of express consent to the entry of a default judgment, a clearer case for the necessity and propriety of such a judgment could hardly be imagined. On appeal, as we have said, the complaint was held sufficient to state an antitrust claim under several theories and after all that was said at the February 8 hearing *Toolco could hardly have been shocked* that it then found itself left with nothing to litigate but damages.

The language of the panel on the previous appeal with respect to the Hughes nonappearance is as relevant in this context as it was to the issue presented by the default with respect to the counterclaims:

"When Hughes chose not to appear for this deposition—which action was taken deliberately and with full knowledge of the sanctions available to the additional defendants under Rule 37— Judge Metzner was fully justified in entering judgments dismissing the counterclaims against TWA and the

additional defendants. The sanction of judgment by default for failure to comply with discovery orders is the most severe sanction which the court may apply, and its use must be tempered by the careful exercise of judicial discretion to assure that its imposition is merited. However, where one party as acted in willful and deliberate disregard of reasonable and necessary court orders and the efficient administration of justice, the application of even so stringent a sanction is fully justified and should not be disturbed."

Chief Judge Lumbard further elucidated in words pertinent on this appeal:

"beyond any question * * * the deposition of Hughes was necessary to all aspects of this litigation. * * * Hughes has at all times been sole owner of Toolco and the guiding light behind all the transactions between Toolco and TWA. Both TWA and the additional defendants had the right to depose Hughes.

\* \* \* \* \* \*

Hughes' deposition was absolutely essential to the proper conduct of the litigation. Yet he and Toolco seized upon every opportunity to forestall this event. * * * Indeed, Hughes and Toolco seemed to look upon the entire discovery proceedings as some sort of a game, rather than as a means of securing the just and expeditious settlement of the important matters in dispute. It was only at the very eve of the Hughes deposition—after the other litigants had been put to much delay and expense—that the defendants made a 'business decision' to terminate discovery.

Hughes' conduct is particularly intolerable in a large and complex litigation such as this one. The protracted antitrust suit taxes the energies and resourcefulness of each party to the litigation; and it consumes much time of the court and the special masters it appoints. Tactics such as Hughes' serve only to frustrate the implementation of the discovery machinery devised by the federal judiciary to expedite the handling of such complex litigation." 332 F.2d at 614–615.

Nor was that panel's references to the necessity of Hughes's deposition to "all aspects of this litigation" gratuitous. It was prompted by Toolco's position on the earlier appeal that Hughes's deposition was relevant *only* to the TWA action and not to the counterclaims. Even if we are not bound in a strict legal sense by the previous ruling that Hughes's deposition was essential to TWA's claim, that holding was manifestly correct. As will be seen, many of TWA's asserted charges relied on interpretations of intent and of the significance of ambiguous projects quickly aborted, and of possible explanatory actions taken by Toolco that may or may not have been relevant to TWA's several antitrust theories. The reality behind the charges could hardly be tested without the testimony of the one man who personally directed Toolco's activities throughout the relevant period and whose singular penchant for secrecy was, after two years of frustrating delay in the conduct of the litigation, well known to the Master and the trial court. Clearly the court was entirely correct in concluding that the litigation would only continue its desultory course without the appearance on stage at the earliest possible moment of the hitherto unseen Prince of the drama. Thus, the court's decisions to postpone all further discovery by Toolco—discovery of the sort which had not substantially advanced the litigation in the past—were not only within its discretion but quite obviously correct. Indeed, in light of TWA's express reliance on Hughes himself to establish as much as 75% of its own case against Toolco, one would have expected that Toolco might have welcomed the opportunity to force TWA to play the card that it had proclaimed was so important to its case, in the expectation that a disappointing deposition would open the way for an early termination of the case favorable to Toolco. Toolco's argument that TWA had not by February 8 laid a

sufficient foundation for its case thus falls as well, because by failing to produce Hughes, Toolco deprived both TWA and itself of the opportunity to establish their respective positions. Finally, the suggestion that the court might have resorted to some sanction short of a default judgment after Toolco had announced a policy decision to take an action that would give it the right to take an immediate appeal—which only a final judgment on the merits would accomplish—and following the wilful refusal to produce a witness whom the court had rightly found central to the expeditious progress of the lawsuit, has such an air of unreality about it as to bear its own refutation. Contrast Rosenberg, Sanctions to Effectuate Pretrial Discovery, Colum.L.Rev. 480, 495 (1958) (giving party "second chance" desirable in appropriate case).

Toolco intimates that throughout the litigation TWA sought in bad faith to win a fabricated case by exploiting Hughes's known craving for solitude. Nothing in the record would justify any such finding, and in any event the district court did offer to permit the deposition to be taken in as much privacy and under any other conditions that might suit Hughes's aversion to public appearance.

The cases relied on by Toolco are far afield and demonstrate by negative implication the inevitability of the default in this case. For example, in Gill v. Stolow, 240 F.2d 669 (2d Cir. 1957), the court reversed the entry of a default only upon a showing of a "real attempt to comply" with an order requiring the witness to travel from England to New York for the deposition, a trip the court found actually barred by his ill-health. There, the witness defied doctors' orders to appear for the deposition within two months of the time scheduled for taking it. As far as we know, defendants have never in the eight years since the default judgment represented that Hughes was willing to be deposed were the default vacated. Von Der Heydt v. Rogers, 102 U.S.App.D.C. 114, 251 F.2d 17 (1958)

(per curiam) reversed a default judgment only upon a conclusion that the district court had not adequately set forth its findings. Concurring separately, then Circuit Judge Burger commented that "if the information sought is material to the case and not privileged, and if appellant was able to produce it, failure to produce warrants dismissal." Id. at 19. That is precisely the case here, except that the information sought was more than merely "material." It was essential. It could prove to be the life or death of the action. In Independent Productions Corp. v. Loew's, Inc., 283 F.2d 730 (2d Cir. 1960), we simply found full compliance with the only court order outstanding at the time of the default judgment and concluded that the default judgment was improperly entered merely because when the witness appeared for the deposition he raised a Fifth Amendment privilege. See also Bon Air Hotel, Inc. v. Time, Inc., 376 F.2d 118 (5th Cir. 1967), cert. denied, 393 U.S. 815, 89 S.Ct. 225, 21 L.Ed.2d 179 (1968) (petitioner's failure to comply due to inability brought about neither by its own conduct nor by circumstances within its control did not warrant default judgment). Finally, Societe Internationale v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1957), as in Gill, reversed a default judgment only on the strength of findings by the Special Master, adopted by the district court, and approved by the court of appeals, that the party had made good faith and diligent efforts to execute a production order where compliance would have violated Swiss law.

Indeed, the circumstances mandating entry of a default judgment here are stronger than in Hammond Packing Co. v. Arkansas, 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909), where the party against whom a default judgment was entered claimed a privilege that it urged justified its noncompliance. Despite this, the Court ruled that because the Hammond Co. "absolutely declined to obey the order," which required production of evidence that the court could only "assume was material," in view of the non-com-

pliance, the default judgment was proper. As in this case, Hammond too relied on the denial of pretrial motions by the defaulting party that would have postponed compliance with or modified the order. The Court found no abuse of the district court's broad discretion to control pretrial procedures.

In light of the foregoing, it would appear that were less at stake in this litigation, the propriety of the default judgment would not have deserved the full discussion we have afforded it. The entry of the default judgment was inescapable and virtually invited by Toolco.

### IV.

■ Toolco, assuming *arguendo* that we would hold that the default judgment was properly entered against it on TWA's complaint, seeks nevertheless to avoid any liability for the antitrust violations alleged by TWA on the ground that we are required to find as a matter of law that facts essential to establish any such violations, although alleged in the complaint, are in fact untrue and could not have been proved by TWA at a trial. To the extent that the allegations of antitrust infringements are not conclusively disproved, so Toolco asserts, the allegations themselves are either too vague or conclusory or otherwise insufficient to support any recovery whatever. We disagree.

Despite inevitable sharp contrasts of tone and emphasis in the voluminous briefs, the parties do not seem to disagree that Judge Metzner, in preliminary rulings prior to the damage hearing and again in his decision adopting the report of the Master, applied an entirely correct standard in defining the legal effect of a default judgment. We too find Judge Metzner's discussions of the law in this complicated area unexceptionable. Extracting justiciable standards from the venerable but still definitive case, Thomson v. Wooster, 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885), Judge Metzner ruled that by its default Toolco admitted every "well pleaded allegation"

of the complaint, a term of art which Judge Metzner interpreted to permit finding an allegation not to be "well pleaded" only "in very narrow, exceptional circumstances:"

> "For example, an allegation made indefinite or erroneous by other allegations in the same complaint is not a well-pleaded allegation. Other examples * * * are allegations which are contrary to facts of which the court will take judicial notice, or which are not susceptible of proof by legitimate evidence, or which are contrary to uncontroverted material in the file of the case." 308 F.Supp. at 683.

Judge Metzner then discussed the meaning that the much-mooted phrase "judicial notice" should take in the present context, as distinguished from the much different circumstance of a full trial, and summarized his previous discussion as implying that "only indisputable facts"—facts which could not possibly be rebutted if the non-defaulting party were permitted a trial—may be judicially "noticed" to rebut factual material otherwise admitted by a default. Toolco now attempts to hoist Judge Metzner by his own petard in directing our attention away from the "judicial notice" standard to certain "material in the file of the case" introduced by Toolco during the hearing on damages which according to Toolco has not been "controverted" by TWA. But this argument stands the matter on its head and implies that it was TWA's responsibility to defend the allegations of its complaint by rebutting adverse matter introduced by Toolco in the damage hearing. TWA had no obligation to introduce any evidence whatever in support of the allegations of its complaint. Matter introduced by Toolco to disprove or mitigate damages which only *tends* to contradict the allegations of the complaint has no legal effect except as it bears on the question of damages unless it could not conceivably have been refuted and disproved by TWA had there been a trial and thus is "indisputable." It would usher in a new era in the dynamics of litigation if a party could suffer a

default judgment to be entered against it and then go about its business as if the judgment did not exist and as though, despite the opportunities to comply with the court's orders and to defend on the merits which had been ignored, the slate was wiped clean and a new day had dawned. To state the proposition is to expose the folly of it.

The applicable principles are clearly implied from Thomson v. Wooster, *supra*, where the court held that defendants who had defaulted in a patent infringement suit would not be permitted to show that the patent sued upon was invalid. Defendants had sought to introduce the original patent to show it differed from a reissued patent, which was the patent the plaintiffs sought to enforce. The court ruled that neither this proof nor evidence that defendants had delayed 14 years in seeking reissue were sufficient to defeat the contrary allegation of the validity of the patent contained in the complaint because, *inter alia*, the delay "might possibly have been explained, and the court could not say as a matter of law, * * * it was insusceptible of explanation. * * *" We are instructed by *Wooster* that so long as the facts as painted by the complaint *"might * * * have been the case"* they may not now be successfully controverted by Toolco. There was a time for that and Toolco cannot elect to default and then defend on the merits. It cannot have its cake and eat it too.

Toolco's adversion to TWA's alleged failure to buttress its allegations in effect seeks to have us review the evidence presently in the record as though we were passing on a motion by Toolco for summary judgment supported by appropriate affidavits following normal discovery proceedings and prior to entry of any final judgment. In such a case, we would grant the motion unless TWA "set forth specific facts showing that there is a genuine issue for trial." F.R.Civ.P.

56(e). But TWA need not introduce any facts whatever in support of its complaint. Judgment has already been entered in its favor on a complaint held on the earlier appeal to this court to state a sufficient claim. Only damages remained to be determined. As Judge Metzner ruled "[w]here file material is involved, if the plaintiff did not have full opportunity to meet or controvert such material, then it should not be used to nullify the allegation." This conclusion is the clear implication of the Court's refusal to permit the admission of the prior patent in *Thomson*.

■ We have, nevertheless, reviewed all the evidence introduced and relied on by Toolco in its attempt to negative its liability and conclude that Toolco has shown nothing that renders inconceivable the likelihood that TWA could have proved at trial that actions by Toolco which formed the basis for the award of damages were in fact, as alleged in the complaint, violations of the antitrust laws. Although we have found it desirable to set forth and affirm the propositions of law relied upon by the district court and by both Masters involved, it would serve no useful purpose to rehash in detail the arguments which defendants have repeatedly urged to show that the exacting test of Thomson v. Wooster has been met and which incidentally have been rejected both by Judge Metzner and Special Master Brownell in thorough and well-reasoned opinions.[3]

Briefly, as we said on the earlier appeal, the allegations of the complaint "state the outlines of a tying arrangement, an economic boycott of the defendants' competitors, and an attempt to monopolize commerce, all unlawful under the antitrust statutes." 332 F.2d 602, 611. Specifically, in the first of three claims set forth in the complaint—the only claim upon which TWA introduced evidence of damages—TWA contended that Toolco, 100% owned by Hughes

---

3. We also are in agreement with the similar statements of the applicable principles of law contained in Brownell's report, as well as those in a preliminary opinion of Special Master Rankin dated July 30, 1965, and in an earlier opinion of Judge Metzner, reported at 38 F.R.D. 499 (S.D.N.Y.1965).

throughout the relevant period, acquired control of TWA and made it a "captive market" for Toolco "with the primary purpose of restraining and monopolizing the trade and commerce" of TWA, which was alleged to constitute a substantial proportion of various defined markets for airplanes, including jets, and related equipment. TWA further alleged that defendants intended that Toolco would become the sole source of supply of jet-powered aircraft to TWA (thus by implication intending to monopolize a substantial portion of a defined market) and a dominant source of supply of jets to air carriers generally; that suppliers to TWA other than Toolco would be boycotted; and that defendants would cause Toolco to supply TWA with aircraft only upon condition that TWA would accept financing dictated by Toolco.

Quite apart from proof of intent, paragraph 9 of the complaint alleged that defendants conspired to restrain trade in violation of Section 1 of the Sherman Act; provided financing to TWA only on the condition that plaintiff buy all aircraft needed for its operations from Toolco; required TWA to boycott all suppliers of aircraft except Toolco; conspired to monopolize the TWA market in violation of Section 2 of the Sherman Act; attempted to monopolize the TWA market, also in violation of Section 2 of the Sherman Act; and sold and leased jets to TWA on the condition that TWA not buy or lease the goods of a competitor of Toolco, in violation of Section 3 of the Clayton Act.

Paragraphs 11 through 29 of the complaint set forth in detail specific acts performed in furtherance of the offenses charged and for the improper purposes alleged, as outlined above. Thus, according to the complaint, Toolco first acquired TWA with the intent to make it its own market for supplying aircraft, an intention which was carried through into the advent of the commercial jet age during the years 1955–56. In 1956, according to these allegations, Toolco ordered a total of 33 Boeing jets and 30 additional Model 880 jets manufactured by General Dynamics Corporation ("Convair"). At the same time, defendants prohibited TWA from "making any arrangements for the acquisition, by sale, lease, or otherwise, of any jet-powered aircraft." The complaint goes on to say that throughout 1956–60, Toolco refused to assign to TWA the rights to acquire the jets on order from Convair and Boeing, despite TWA's requests that it do so and despite provisions in Toolco's contracts with Boeing and Convair that permitted it to do so. Jets leased to TWA by Toolco on a day-to-day basis in 1959–60 were the only jets made available to TWA during the years 1955 to 1960 and were inadequate to TWA's needs, it was charged. Each lease was conditioned on TWA's agreement and understanding that it would not purchase or lease aircraft from any other supplier. In 1960 six of the Convair 880's Toolco had ordered in 1956 were leased to Northeast Airlines, including three previously assigned to TWA. Similarly, in June, 1959, six of the Boeing jets ordered in 1956 were "diverted to the principal transatlantic competitor of TWA" (Pan Am). While thus restricting TWA's purchases of jets, the complaint alleged that Toolco also inhibited TWA's ability to obtain equity financing and caused TWA to rely chiefly on debt financing, thus rendering TWA unable to finance needed aircraft acquisitions except upon Toolco's approval. Toolco intended by this restriction to increase TWA's dependence on Toolco in furtherance of its unlawful purposes. From 1955–60 defendants prohibited TWA from obtaining financing for the acquisition of jets required for TWA's needs.

The damages which Brownell ultimately awarded to TWA consisted primarily of profits lost as a result of (1) diversion of the six Convairs to Northeast; (2) temporary retention by Toolco of four additional of the ordered Convairs and the ultimate lease of those jets to Northeast; (3) diversion of the six Boeings to Pan Am; (4) the lease, instead of outright sale, of jets in 1959–60; and (5) late delivery of 47 of the

63 jets ordered in 1956, which would have been avoided if, by the allegations of the complaint, Toolco had not unlawfully constricted TWA's financing and acquisition of its own jet fleet. Although TWA also attempted to prove other damages resulting from Toolco's manipulation of its financing, and further damage arising from delayed sales of obsolete prop aircraft, Brownell found TWA's proof in these respects insufficient and TWA does not appeal from either determination. No damages were sought to be proved for alleged continuing antitrust violations by Toolco subsequent to December 15, 1960, when Toolco put all its TWA stock in a voting trust controlled by three voting trustees (including Holliday), thus relinquishing control of TWA, an action required as a condition of loans to TWA advanced by various banks and insurance companies to permit the purchase of new jets.

■ As it did before Brownell and Judge Metzner, Toolco now seeks to discredit primarily one part of paragraph three of TWA's complaint, in which TWA alleged that Toolco had been engaged since 1939 "in the development, manufacture and acquisition of aircraft and related equipment" and its "sale and lease" to air carriers, and to demonstrate the inadequacy of one antitrust theory that, according to Toolco, collapses if the allegations of paragraph three are untenable. Toolco thus would have us find United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), to be the linchpin of TWA's complaint, without which the remainder cannot hold together. In *Yellow Cab*, the Court reversed the grant of a motion to dismiss a complaint which had alleged that a company engaged in the business of manufacturing taxis had established control of a substantial segment of cab operations in four cities and had exploited its control by extracting exclusive purchasing agreements from its owned cabs and taxi companies, thus excluding other manufacturers from the affected market with the ultimate effect, as the Court said, that "the appellees effective-

ly limit the outlets through which cabs may be sold in interstate commerce." *Id.* at 226, 67 S.Ct. at 1565. This argument fails at each of three points. Toolco has not established to our satisfaction that TWA could not possibly have proven violations analogous to those alleged in *Yellow Cab*. Even if it had, additional specific allegations of antitrust violations in the complaint other than the one which rests on the holding in *Yellow Cab* are not conclusively disproved by Toolco's evidence. Nor has Toolco demonstrated that TWA's postulates for recovery are in any other manner not "well pleaded."

■ To disprove the allegation of paragraph 3 that Toolco was a "manufacturer" of commercial airplanes, Toolco relies primarily on (1) CAB opinions and orders dating from 1944–50 that concluded Toolco was not then engaged in or planning the manufacture of airplanes for commercial use, (2) schedules to CAB Form 41 Reports filed by domestic trunk airlines pursuant to 49 U.S.C. § 1377 indicating that between 1950 and 1966 none of these airlines purchased or leased a Toolco-made airplane, and (3) the fact that no TWA annual report ever mentioned the manufacture of a "Hughes plane." These documents, Toolco asserts, conclusively establish that Toolco was never a manufacturer of commercial aircraft and certainly not a competitor with the giant manufacturers—Boeing, Douglas, and Convair—and thus the exclusive dealing arrangements alleged in the complaint are entirely innocuous and incapable of producing the kind of market foreclosure alleged in *Yellow Cab*. Toolco similarly sets out to undermine the allegation that it was a "dealer" in aircraft, again directing attention to CAB opinions and orders dated no later than 1950 finding no sales or leases of planes by Toolco to any airline but TWA; and again introducing the Form 41 Reports to the same effect but extending to 1961. The thrust of its argument is that under no view of the complaint, given the facts established by these documents, could TWA conceivably have proved more than

that Toolco as a parent of TWA engaged in good-faith efforts to rescue it from financial crisis and to operate it as a successful business enterprise. Even if TWA could prove mismanagement by Toolco, that is insufficient, in Toolco's view, to intimate any possible foreclosure of competition—since Toolco was a mere manager or conduit and had no independent competitive significance—and accordingly TWA's theories must be found barren, since danger to free competition is the *raison d'etre* of the antitrust laws and some showing of such a danger in every case is a *sine qua non* of proving their infringement.

Both Judge Metzner and Master Brownell met Toolco's argument in this respect head-on, holding that courts could not consider as conclusively proven facts merely recited in CAB orders and opinions and in airline reports that are the product of no adversary proceedings, distinguishing between the *existence* of such documents, of which courts might in an appropriate case take judicial notice, and the truthfulness of their contents, which would be subject to contrary proof had the trial precluded by Toolco's default actually been conducted. We agree with the reasoning of both opinions and find the authorities there relied on to be in point and sound. See Stasiukevich v. Nicolls, 168 F.2d 474, 479 (1st Cir. 1958); McCormick on Evidence § 328 at 704, § 330 at 709 (1954); Morgan, The Law of Evidence, 1941–45, 59 Harv.L.Rev. 481, 482–87 (1946); McNaughton, Judicial Notice, 14 Vand.L. Rev. 779 (1961).

 Moreover the documents described above, while (if their contents were accepted as true) showing that Toolco was not a major force as a supplier of aircraft other than to TWA, hardly negative the possibility that Toolco possessed independent economic significance, apart from its role as supplier to TWA, sufficient to support proof of any or all the antitrust theories limned by TWA's complaint. There is evidence in the record of activities by Toolco or Hughes that suggest significant movement by Toolco and Hughes toward actual or potential commercial manufacturer or dealership in airplanes, especially jets, and their parts. We cannot say that proof at a trial—prevented by Toolco's conduct—that Toolco was more than a conduit for TWA but rather possessed independent competitive significance with respect to the commercial aircraft market, would be insufficient, if combined with appropriate related proof of the intent, attempt, collusion, tying arrangements, boycotts, and monopolization alleged in the complaint, to support an antitrust judgment for TWA.

The evidence that Toolco's interests and ambitions in commercial air flights may have extended beyond mere management of TWA begins with Toolco's admitted role, initiated in World War II and continuing to the present day, as a substantial manufacturer of helicopters and aircraft parts for military purposes (and now of aerospace materials as well). Although Toolco stresses the non-commercial nature of this activity, it is clear that Toolco throughout the relevant period had the technical capability and sophisticated "know-how," to enter the commercial market without untoward delay if it had so chosen. Early in its history, Toolco acquired the rights to the first forty Constellation aircraft developed in cooperation with Lockheed in the early 1940's. Twenty-five of these were intended by Toolco for sale to airlines other than TWA. 6 CAB 153, 155 (1944). During and after the war, Hughes actively engaged in the development (ultimately unsuccessful) of a plan worthy of Jules Verne, for a 700-passenger plywood flying boat for commercial development. Manufacture by Toolco of aircraft in association with AVRO of Canada, and of Caravelles as a licensee of Sud Aviacion of France, were considered during the middle 1950's. In 1956, Toolco ordered at least 300 Pratt & Whitney jet engines, later sold primarily to Boeing and Pan Am at a substantial profit. The engines could well have been intended for installation in the planned Toolco jets and in any

event constituted Toolco as a competitor with other sellers of jet engines.

Also in 1956, secret discussions were commenced within the inner circles of Toolco and TWA for Toolco to manufacture commercial jets, a plan scuttled before the end of that year by the initiation of a CAB investigation into the matter which followed a TWA motion to the Board for approval to purchase up to 25 Toolco-manufactured commercial jets. Through most of 1955, Toolco was engaged with Convair in the development of a jet which again proved unfeasible. Evidence of these last mentioned aborted forays is consistent with allegations in paragraphs 14 and 15 of the complaint that defendants arranged with Convair to develop "a jet-powered aircraft to be manufactured by Convair and to be supplied by the defendants to air carriers" and that "defendants also entered into a plan under which Toolco would itself" manufacture jets to be furnished "both to TWA and to other air carriers."

Additionally, there was testimony that Toolco ordered seven Convair 880's manufactured to the specifications of Capital Airlines and thirteen Convair 990's built for American Airlines' requirements.

Finally, Toolco's activities with respect to the 63-plane fleet ordered in 1956, only part of which was ever delivered to TWA, further support an inference that Toolco contemplated that it was or might become more than a manager for TWA. Thus, Toolco conditioned its order for the Convair 880's on a stipulation that the price to it would be reduced progressively as Convair was successful in selling more of the planes beyond the initial orders by Toolco and by Delta Airlines, Inc., a condition consistent with possible Toolco participation in marketing the 880. Nonassignment provisions in the purchase agreements do not conclusively negate the capacity of Toolco to have dealt in its Boeing and Convair contracts and priority rights with airlines other than TWA—and of course Toolco did not in fact exercise its right to assign the contracts to TWA.

Ultimately, of course, as alleged in the complaint and demonstrated at the damages hearing, defendants did sell or lease 16 planes of the ordered 63-plane fleet to Pan Am and Northeast. As Master Brownell observed, the ability of Toolco to deliver these jets immediately may have given Toolco a significant competitive advantage over their own manufacturers. Late in 1959, Hughes negotiated with Lockheed for purchase of Electras at a time when Toolco's own actions indicated TWA was fully stocked with jets.

Toolco's response to most of these considerations is that each is consistent with a sole intent on its part to deal in aircraft and aircraft parts solely for the benefit of TWA. However, the allegation in the complaint that Toolco refused to assign the rights to the ordered fleet to TWA although it was empowered to do so under the contracts of sale, is consistent with a contrary inference.

■ In any event, the question is not whether one inference or another is the stronger but whether Toolco's evidence—in light of its default and thus the absence of a trial—absolutely forecloses the possibility that Toolco enjoyed actual or potential independent competitive significance in the commercial aircraft market sufficient to support a finding of an antitrust violation under any of the several hypotheses put forward in the complaint, including, in addition to the *Yellow Cab* theory, (1) unlawful *intent* to monopolize a substantial portion of the commercial aircraft market in restraint of trade; (2) unlawful conspiracy to do so, see Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 284 F.2d 1 (9th Cir. 1960), rev'd on other grounds, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed. 2d 458 (1962); Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998

(1968); Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); (3) enforcement of an illegal boycott, see Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); United States v. New York Great Atlantic & Pacific Tea Co., 173 F.2d 79 (7th Cir. 1949); Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L. Ed.2d 741 (1959); (4) tying adequate financing of TWA to its purchase or lease of jets from Toolco, and vice-versa, see Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 502–503, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); and (5) the lease of aircraft to TWA on the condition that TWA not purchase or lease aircraft from other suppliers, see International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

 Toolco's reply brief argues that the allegations of unlawful intent are unduly vague but this is unsupported by the cases it relies on, Glenn Coal Co. v. Dickinson Fuel Co., 72 F.2d 885, 888 (4th Cir. 1934); SCM Corp. v. Radio Corp. of America, 407 F.2d 166 (2d Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969) (mere conclusory and vague allegations and nothing more, of unlawful attempt or conspiracy to monopolize or to restrain trade, or, simply, to violate the antitrust laws, were held insufficient). By contrast, TWA's complaint alleges specific acts by defendants allegedly pursuant to an intent to monopolize specified markets by means which are described in detail in the complaint. These allegations are both adequate as a matter of proper pleading and sufficiently definite to support an award of damages entered on the default judgment.

 Toolco's argument that a conspiracy among Holliday and Hughes, as officers and shareholders of Toolco, with Toolco itself, is as a matter of antitrust law unprovable, is an illustration of the thrust of Toolco's approach to the question whether the decisive allegations in the complaint are "well-pleaded." Whether TWA might have proven such a conspiracy would have turned on the nature and weight of technical and secretive evidence bearing on the independent economic significance of each of the parties and also on subjective questions of intent and attempt. Toolco's conduct barred even initial exploration of these crucial factual issues. We are reminded that even summary judgment "should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." Poller v. Columbia Broadcasting System, Inc., *supra*, 368 U.S. at 473, 82 S.Ct. at 491. See also White Motor Co. v. United States, 372 U.S. 253, 259–260, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). We should be far more reluctant to grant summary judgment for Toolco following entry of judgment for TWA, as it now in effect requests us to do, when its own default barred even initial exploration of the crucial factual issues.

### V.

 The opinions below and the briefs submitted to us on this appeal reveal some confusion as to the proper scope of the hearing on damages. As the authorities cited above illustrate, a default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability. Also, at the hearing before Special Master Brownell it was incumbent upon TWA to introduce evidence showing the extent of the damages which resulted from the antitrust violations established by the default judgment. The difficulty arises as to a question that Toolco refers to in part II of its main brief as one of "proximate cause." To what extent did the default judgment dispense with a plaintiff's normal obligation to show that damages alleged were proximately caused by Tool-

co's illegal actions? The answer seems to us inherent in the question.

▮ The default had the effect of admitting or establishing that the acts pleaded in the complaint violated the antitrust laws and that those acts caused injury to TWA in the respects there alleged. Because, however, the damages were unliquidated and uncertain, F.R. Civ.P. 55(b), it was necessary for TWA at the hearing to establish the *extent* of the injuries established by the default. The outer bounds of the recovery allowable are of course measured by the principle of proximate cause. The default judgment did not give TWA a blank check to recover from Toolco any losses it had ever suffered from whatever source. It could only recover those damages arising from the acts and injuries pleaded and in this sense it was TWA's burden to show "proximate cause." On the other hand, there was no burden on TWA to show that any of Toolco's acts pleaded in the complaint violated the antitrust laws nor to show that those acts caused the well-pleaded injuries, except as we have indicated that it had to for the purpose of establishing the extent of the injury caused TWA, in dollars and cents.

Thus, in Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 284 F.2d 1 (9th Cir. 1960), rev'd on other grounds, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962), cited by Toolco, the court held that an antitrust plaintiff could not recover for losses attributable to a watered-down product rather than to defendant's acts. To the same effect are the other cases relied on by Toolco, e. g., Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561 (7th Cir. 1951), cert. denied, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1962) (plaintiff could not recover for losses based on defendant's illegal restriction on its distribution of first-run movies during a period when plaintiff's theatre was not equipped to show first-run movies). TWA purports to dispute Toolco's abstract statement of the appropriate scope of the damage hearing, relying on an unreported dis-

trict court opinion whose reasoning on the issue of proximate causation we adopted in Jones v. Uris Sales Corp., 373 F.2d 644 (2d Cir. 1967). While TWA cites *Jones* for the proposition that at the damage hearing it had no obligation to show proximate cause in any sense, the central language of the district court opinion in *Jones* which TWA relies upon belies its own assertion: "[t]he causal relationship is stated distinctly in the complaint by the allegation that Penn diverted profits belonging to the defendant Uris. All that remained to be supplied were the identities of the accounts and the enterprise *to which they were diverted*, and the amount of *the profits diverted * * *.*" (Emphasis added.) Implicit in the limiting words we have emphasized is the proposition that it was plaintiff's obligation following the default to establish that any lost profits for which it sought recovery were in fact those whose unlawful diversion was established by the default judgment. The default judgment proved the fact of the diversion (the injury) and its illegality. But to recover damages, plaintiff was necessarily required to establish that those damages were attributable to the diversion. Thus, however well-pleaded the allegation that profits were diverted, plaintiffs in *Jones* could not avoid, to the extent necessary to establish the causal nexus for the recovery of damages, introducing evidence relating to the diversion alleged.

▮ Nor do we believe, contrary to Toolco's assertion, that Special Master Brownell misunderstood this issue. His formulation that the "burden of establishing proximate cause is satisfied *as to liability* if proximate cause is adequately alleged in the complaint" (emphasis added) is consistent with our own understanding of the law and, as we will elucidate shortly, we find his application of the proper principles to have been unexceptionable. In fact, Toolco helpfully reminds us that Special Master Brownell disallowed two major elements of damage alleged by TWA. We have reference to those supposedly arising from the as-

sertions in TWA's complaint that it was chronically under-financed by Toolco and from TWA's claimed tardy sale of its prop fleet. His conclusions on this score were based on his determination that TWA's proof that those damages arose from the illegal acts and injuries established by the default judgment was inadequate.

Despite its present broad assertion (perhaps in an excess of caution), that "proximate cause" was in no sense an element essential to establishing recoverable losses, TWA's strategy at the hearing, with respect to the damages actually awarded, was in fact designed to prove causation. To illustrate, and to lay the foundation for our discussion of Toolco's various claims that in several respects TWA's proof of causation was inadequate, we conclude this portion of our opinion by sketching the contours of the evidentiary foundation of TWA's damage award.

TWA's most important witness was Robert W. Rummel, at the time of the hearing TWA Vice President for Planning and Research. Rummel testified to the effect that had Hughes and Toolco not interfered with TWA's operations in the manner alleged in TWA's complaint, TWA would have attempted to acquire in the commercial market a jet fleet of its own consisting of the same 63 airplanes we have made reference to—33 Boeing 707's and 30 Convair 880's—which Toolco did in fact order for TWA and which were ultimately delivered to Toolco in 1959–60. As we have noted, major elements in the damages awarded were losses incurred by TWA and caused by Toolco's diversion of 16 of these jets, 6 Boeings and 10 Convairs, to Pan Am and Northeast and delays in the delivery of the Boeings and Convairs that were not diverted. Brownell accepted only in part Rummel's testimony that the delays in the Convair deliveries were solely attributable to Hughes's misconduct, but he fully accepted Rummel's testimony as to the makeup of the "reconstructed" 63-jet fleet. His report concluded that only the Convair delays beyond those provided in a March 2, 1960, amendment to the original delivery schedule were chargeable to defendants, since delays reflected in that amendment were caused by Convair's own mismanagement.

John B. Connelly, Vice President and Assistant General Manager of Boeing Aircraft Division corroborated TWA's claim that delays in Boeing deliveries were caused by defendants' failure to negotiate with reasonable diligence for priorities in delivery dates in 1955 when jets were first offered commercially. The thrust of the Connelly-Rummel testimony was that if defendants had not, as alleged in the complaint, prevented TWA from negotiating for itself, it would have ordered and received a full 63-jet fleet sooner than it in fact received the abbreviated 47-jet fleet from Toolco. Apart from a portion of the Convair delays, Brownell credited this evidence in its entirety. The illegality of Toolco's arrogation of all authority for buying aircraft was, as we have said, conclusively established by the default judgment.

Two other fact witnesses for TWA testified as to losses caused by disruptions in the transition from prop to jet operations attributable to defendants' interference with the Convair 880 deliveries. The Special Master adopted their computations without reservation and, except for Toolco's attack on the underlying finding of disruption already referred to, Toolco does not seem to press its argument that the proof with respect to these items was inadequate.

The testimony of TWA's four expert witnesses fared somewhat worse with the Special Master than did that of its so-called "fact witnesses." Brownell rejected a "Comparative Profit Study" report comparing TWA's actual profits with two of its competitors during two separate periods offered in an effort to prove TWA's losses. The report was prepared by Coverdale & Colpits, a consulting engineering firm, and testimony concerning it was given by a partner in the firm, Edward L. Wemple. The Special Master

did, however, accept the computations contained in a second Coverdale report tracing in detail the operating losses attributable to Toolco's disruption of the jet fleet for the years 1959–63. These computations included an estimate of increased profits that would have accrued had TWA owned outright certain Boeing 707's which Toolco only leased to it in 1959–60, as well as of profits that would have been realized otherwise from timely delivery of the reconstructed fleet.

TWA also attempted to prove damages resulting from Toolco's inadequate financing of TWA by introducing a study prepared by Drexel Harriman Ripley, Inc. (the DHR study) testimony concerning which was given by its Senior Vice-President, Edward J. Morehouse. Morehouse testified that if TWA had been independently and competently managed during 1955–60, it could have financed the purchase of the reconstructed fleet at much lower costs than those actually incurred through Toolco's management. The program of independent financing described by the DHR study was rejected by Brownell, as was a report prepared by R. Dixon Speas Associates estimating TWA losses from belated sales of piston airplanes.

Finally, John C. Biegler, a partner of Price Waterhouse & Co., testified with respect to a report in evidence and prepared by his firm under his supervision which reconstructed TWA's historical financial posture on the basis of TWA's evidence of disruptions and their supposed effects which were caused by Toolco. The Price Waterhouse study, as supplemented at times during the hearing, was the vehicle through which evidence of both sides bearing on the effect on TWA operations of supposed Toolco disruptions was translated into differences between actual and hypothetical TWA profits.

Toolco's direct case consisted of testimony of four expert witnesses, Gene M. Woodfin, partner in Loeb, Rhoades & Co., investment brokers, and Nathan S. Simat, Robert I. Helliesen and L. John Eichner, principals in the aviation consulting firm of Simat, Helliesen & Eichner, Inc. Each of defendants' experts sought to discredit the evidence of Wemple, Morehouse, and Speas.

Thus, as is apparent from the above summary, TWA did not rely only on its default judgment but introduced evidence linking each component of the damages claimed to the pleaded illegal acts of Toolco and injuries to TWA. Toolco contends, however, that TWA's proof should have been rejected by the Special Master and that TWA has not established that the delays in delivery, the diversions, or the Boeing leases caused any damage to TWA attributable to those acts and injuries.

### VI.

Both sides agree that Special Master Brownell's findings, adopted by Judge Metzner, may not be disturbed at this juncture unless we agree with Toolco that they are "clearly erroneous," F.R.Civ.P. 52(a), the standard also properly applied by Judge Metzner himself in reviewing the Master's Report, F.R. Civ.P. 53(e) (2). Our function would seem to be in a sense redundant, since it appears that each of the substantial objections to the Master's conclusions raised by Toolco before us has already been considered and rejected by the district court. But because of the huge sums involved in this litigation, we have not been content to rest on Judge Metzner's appraisal of the Master's findings and have made our own independent review of those findings. We agree with Judge Metzner's assertion that it is relevant that Special Master Brownell's report is a product of "painstaking" analysis of highly complex questions following hearings on damages which extended over a period of two years, consisting of hundreds of hours of testimony and producing a transcript of 11,000 pages. See Badenhausen v. Guaranty Trust Co., 145 F.2d 40, 53 (4th Cir. 1944), cert. denied, 323 U.S. 797, 65 S.Ct. 440, 89 L.Ed. 636 (1945); Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 274–275, 69 S.Ct. 535, 93 L.Ed. 672

(1949). We might add that his report reflects an extraordinary awareness of the issues raised and the applicable principles of law.

In this connection we observe that the Master, in considering the proof of both parties, did so with explicit reference to the classic statement of the applicable guidelines expressed in Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946), permitting an award in cases such as this to be based "upon probable and inferential, as well as direct and positive proof," and imposing on the wrongdoer any "risk of uncertainty which his own wrong has created," id. at 265, 66 S.Ct. at 580. Indeed, the Supreme Court recently observed:

> "Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."

Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). In this case the reference to risk in *Bigelow* would seem to have even greater application. Toolco must bear the responsibility for any lack of preciseness of proof, and there is good reason that this should be so. The default itself by Toolco rendered precise proof of damages even more difficult than in the usual antitrust case, where the plaintiff may avail itself of the full battery of discovery procedures to prove damages as well as to prove liability. Toolco cannot be permitted to block the discovery of precise, clear and direct evidence and then be heard to complain that the evidence should have been more convincing.

In any event, our answer to each of the many objections that Toolco raises to the specific findings of the Special Master as to the "proximate cause" of the damages awarded TWA, is that each

of the challenged findings is amply supported by evidence introduced during the hearing and that none is "clearly erroneous." Toolco's arguments on this score are principally five, each of which we shall discuss sufficiently to demonstrate the basis for the Master's conclusions.

1. Toolco attacks first the validity of the entire basis of the damage award, the reconstructed 63-jet fleet which Brownell found constituted "a proper basis for computing damages." That he was justified in doing so is established first by Rummel's testimony that TWA *should* in fact have ordered the fleet that Toolco ordered for it, although with more dispatch. Rummel was TWA's senior engineer in 1943, chief engineer in 1949, elevated to Vice President in charge of Engineering in 1956, was throughout this period closely associated with Hughes himself in his early exploration of the commercial jet market and indeed may have been the only individual with whom Hughes entrusted a share of responsibility for aircraft procurement. Rummel testified that he reported directly to Hughes, had authority to commit funds under Toolco's contracts, and "the Toolco factory representatives at Boeing and Convair reported to me as special representative of Toolco responsible for the technical administration of the Toolco contracts * * *." His primary responsibility throughout most of his employment with TWA "has been to recommend what size and what type fleets to procure * *." In addition to the historical fact that Rummel, chief procurement officer for TWA at the time and Hughes' confidant, participated in and concurred in the decision to acquire the 63-jet fleet, the assumption that TWA would have acted approximately as did Toolco in the interest of exploiting to maximum financial benefit the enormous potential of the jet age is entirely reasonable. Indeed, in view of the well-pleaded allegations of the complaint, asserting that defendants did not always act in the best interest of TWA, and defendants' contrary assertion that it did always so act, it ill-

behooves defendants now to suggest that a well-managed TWA would have acted differently in evaluating its jet fleet requirement than did Toolco.

Assuming then that an independent TWA would have attempted to acquire the same 63-jet fleet ordered by Toolco, defendants contend that TWA would not have been able to finance such an undertaking, which would have cost about $353 million or $93 million more than TWA actually spent for its 47-jet fleet. Toolco notes that $100 million of the financing for the 47-jet fleet was supplied by Toolco itself through its purchase of TWA subordinated debentures. We find untenable Toolco's characterization as insufficient to support the Special Master's contrary assumption that an independent TWA would and could have financed the full 63-jet fleet, the evidence that United, American, and Pan American Airlines each were in fact able to finance comparable ventures during the same period. Toolco directs our attention to financial reversals experienced by TWA during the period preceding the time Brownell assumed TWA would have financed the fleet (1958–59). But the well-pleaded allegations of the complaint demonstrate conclusively that crippling TWA's financial posture and reducing it to a state of vassalage, dependent on Toolco's support, was part of defendants' overall antitrust violation. See Complaint ¶¶ 17, 18, 19, 22, 23, 24, 26, 50, 51, and 52(a). To the extent of negating Toolco's attempted reliance on TWA's asserted financial weakness, these allegations must be given effect. Any inferences other than that an independent TWA would have fared neither better nor worse than competing airlines in financing its jet fleet would have been unwarranted.

3. Assuming then that the 63-jet reconstructed fleet was a reasonable basis for assessing damages, Toolco nonetheless insists that Special Master Brownell erred in his findings that in several respects (concerning the delays in Boeing and Convair deliveries; the leasing of Boeings to TWA; and the diversion of 16 jets to TWA's competitors) an independent TWA would have been managed to better financial advantage. It first attacks the assumption, fully supported by testimony of Rummel and Boeing Vice-President Connelly, that more diligent bargaining for Boeing jets would have resulted in TWA enjoying approximately the same rights to priority in deliveries as did Pan Am, American and United. Rummel's testimony adequately supports the conclusion that TWA would and could have engaged in negotiations reasonably "calculated to preserve TWA's competitive position to the industry for early deliveries," to quote Brownell's words. Connelly, who was in a position to be entirely familiar with Boeing's policies with respect to delivery dates,[4] testified, contrary to Toolco's present contentions, that more diligent efforts by TWA would in fact have resulted in substantial parity of priorities.

Because of Master Brownell's and Judge Metzner's thorough discussions of these questions, and in the interest of curtailing this necessarily protracted opinion, we will not continue to discuss each of the other fine-drawn points raised by Toolco in an attempt to discredit this testimony. It is sufficient that we note we have thoroughly considered each of them and found them insufficient to support a holding of clear error.

4. Special Master Brownell concluded that defendants' dalliance in securing Convair deliveries and its active interference with Convair's production schedule was responsible for delays beyond the amended delivery schedule. This finding is amply supported by evidence of (1) Hughes's refusal to accept delivery of the Convair 880's when Convair was

---

4. Connelly testified that as Director of Contract Administration he was a member of a "headquarters group" at Boeing in 1955 and in 1956 became Vice President and General Manager in charge of the department at Boeing in which responsibility for commercial airline programs was centralized.

ready to deliver them; (2) his assumption of personal control of all matters concerning the deliveries and his direction that TWA was not to proceed with any acceptance procedures without personal clearance from Hughes; and (3) Hughes's personal instructions to Toolco armed guards at one point to forcefully seize four CV-880's from the Convair production lines, thereby aggravating Convair's production difficulties. Moreover, it was uncontested that TWA received its planes on an average approximately 9.9 months later than provided in the original schedule, while deliveries to Delta were delayed by only 1.4 months.

5. Finally, the Master's assumption that TWA as a non-handcuffed independent operator would have purchased outright nineteen Boeings leased to it by Toolco in 1959–60 is supported by evidence in the DHR study establishing that as a general rule outright ownership was more desirable than leasing under the conditions existing at that time, subject to certain exceptions not applicable. Also, in cross-examination, defendant's expert Woodfin, admitted that the 1959–60 leases were an interim and unsatisfactory arrangement. The Master's observation that, of 2,036 aircraft operated by certified route carriers on December 31, 1960, only 117 were leased, is also relevant.

### VII.

Our response to Toolco's objections to certain calculations by Special Master Brownell of damages, given that the elements of injury to TWA—from late deliveries, non-deliveries, leases instead of sales, and resultant disruption—were properly established, as we believe, is based on the same rationale that underlies our conclusions in the preceding portion of this opinion. Once again, we find none of Brownell's findings to be clearly erroneous.

There are essentially two issues raised with respect to the calculation of damages, which seem to be subdivided for purposes of analysis and emphasis many times in the briefs. The first concerns the degree of injury due to Toolco's failure to deliver the 10 diverted Convairs and 6 diverted Boeings in light of the size of TWA's jet fleet over the period of five years, 1959–63, for which damages were assessed. Toolco claims alternatively that certain aircraft purchased by TWA during that period made up for at least part of the lost profits that would otherwise have been incurred as a result of the lost 16 planes. Moreover, to the extent the losses were not thus compensated for, Toolco would attribute the fault not to the diversions but to the failure of TWA's new management to "mitigate" damages by purchasing other jets to replace the diverted ones (as we have noted, three voting trustees, two of whom were not controlled by defendants, assumed control of Toolco's voting stock on December 15, 1960). We do not believe that these claims are inconsistent, as TWA asserts. Rather they amount in the aggregate to a single contention that TWA did in fact partly mitigate damages but could and should have done so entirely, or at least to a greater extent.

The second issue raised is based on the argument that even if TWA's fleet size was decreased as a result of Toolco disruptions to the extent found by Brownell, one cannot calculate the extent to which the larger fleet would have increased TWA's profits.

### A. *Fleet Size.*

All the issues raised with respect to the decrease in the size of TWA's fleet attributable to Toolco's mismanagement turn on the conflict between the testimony of Toolco's experts and that of TWA's expert, Wemple, of Coverdale & Colpits, who prepared and gave testimony concerning two reports estimating damages, assuming TWA had received the full reconstructed 63-jet fleet on schedule, rather than 47 jets late. As we have said, Brownell rejected one report, the Comparative Profits Study, but accepted entirely the calculations of the other, which we will refer to as the Wemple study. To rebut the Wemple

study, Toolco introduced a report by Simat of Simat, Hellieson & Eichner, Inc., which Brownell rejected in its entirety.

According to the evidence accepted by Brownell, the six Boeings were diverted to Pan Am between November 5, 1959 and June 8, 1960 (they would otherwise have been received by TWA between July 19, 1959 and May 9, 1960). The ten Convairs were to be received between December 1959 and September 1960. On March 5, 1959, Toolco told TWA that it would not receive the Convairs. Six were then diverted to Northeast (and in 1963 repurchased by TWA). The other four were retained for a time by Toolco, then sold to Northeast (and never bought by TWA).

Brownell accepted Wemple's estimates that the Convair diversions resulted in the loss to TWA of the use of 5.1 planes in 1960, 9.9 planes in 1961, and 10 planes in 1962, and 7.9 planes in 1963. The six Boeings, unlike the Convairs, were suitable for international as well as domestic use. Brownell accepted Wemple's conclusion that their diversion resulted in a loss to TWA of use of the following quantities of planes in the stated years, for international and domestic use:

| | International | Domestic | Total |
|------|------|------|------|
| 1959 | 0.2 | none | 0.2 |
| 1960 | 3.6 | 1.4 | 5.0 |
| 1961 | 3.7 | 2.2 | 5.9 |
| 1962 | 4.8 | 1.0 | 5.8 |
| 1963 | 0.9 | 0.5 | 1.4 |

The markedly lower figures in each category for 1963 reflect the purchase by TWA in that year of the six diverted Convairs and the lease for use in 1962 and 1963 of five Boeing B-331B's (as substitutes for the diverted B-331's).

Brownell also accepted Wemple's testimony that even if it had received its full 63-jet fleet on schedule, TWA would still have leased, as it in fact did, four B-720B aircraft (a medium range late model Boeing) during 1961–62 and would also have purchased 18 additional B-131B fan jets in 1962. Thus, these purchases were not considered as mitigating the damage caused by Toolco's diversions.

Toolco argues that there is no justification for Brownell's refusal to consider the purchase and lease of these B-720B's and B-131B's as at least partially mitigating damages. Alternatively, it contends that there is no support for the conclusion that any deficiency in TWA's fleet existing in 1959–60 as a result of Toolco's diversions, could have had effects that lingered for four years, into 1963, three years after Toolco relinquished control of TWA. Rather, Toolco insists, at least by 1962 and 1963 any deficiencies in the TWA jet fleet must be attributed either to TWA's business judgment that investment in replacements was not economically justified (thus there could have been no damage resulting from the earlier diversions) or to TWA's unjustified refusal to mitigate damages. The cumulative thrust of this pincer argument is that if TWA would have profited, as Brownell found, from the lost jets, why did not TWA replace them? If it would not have profited, there can be no damages.

We find Wemple's testimony that the B-131B purchases and the B-720B leases did not represent "substitutes" for the lost jets justified by several considerations. First, these assumptions were based on Wemple's background of expertise, and there is no basis in the record for finding they were dictated by TWA's counsel, as Toolco maintains. Second, no airline which commenced using commercial jets in the period during which damages were assessed stood pat and remained contented with its originally acquired fleet during that time. Thus, between 1960 and 1963, Pan Am increased its jet fleet from 38 to 64; United from 34 to 91; and American from 25 to 73 jets. It is entirely reasonable and appropriate to assume TWA would also have expanded its fleet. Thus, it was not for the Master to conclude that the damages caused by the diversions had been entirely mitigated as soon as TWA acquired a fleet of 63 jets, as it did during 1962. It was not until

1963, the last year for which damages were assessed, that TWA obtained a fleet comparable to the 63 jets it should have had in 1959–60, plus those that it acquired in the meantime. Moreover, the transcontinental but not international-range B-131's may not have been an effective substitute for either the lost intercontinental-range B-331's or the diverted intermediate range Convairs. Finally, we note that Toolco failed to present a single expert witness to challenge the claim that the interim acquisitions did not mitigate damages, or to present an alternative assumption; indeed, Simat, Toolco's own expert, relied on Wemple's contention in this respect.

 In support of its claim that TWA failed to mitigate damages, Toolco specifically cites (1) TWA's termination of the B-720B leases in 1962; (2) the decision of a Flight Equipment Committee appointed by TWA in 1961 to lease *only* four B-720B's, instead of six, as recommended by Rummel; (3) a reduction in its order of the B-131B's from an original 20 to only 18 actually purchased in 1962; and (4) its refusal in 1961 to buy the four CV-880's retained by Toolco which were ultimately sold to Northeast.

It is sufficient response to the latter contention to note that the complaint alleges that Toolco offered the CV-880's only on the illegal condition that TWA would not buy jets from Boeing, and Toolco has not shown that this contention was not well-pleaded. This adequately explains TWA's refusal to purchase the CV-880's offered by Toolco. Moreover, there is evidence that neither the B-720B's nor the B-131B's were adequate substitutes for the diverted jets, and thus TWA's actions with respect to those planes are not necessarily indicative of its ability and thus of a deliberate refusal to compensate for the diverted aircraft. In any event, the burden of proof to establish failure to mitigate damages was on Toolco, see Ellerman Lines Ltd. v. The President Harding, 288 F.2d 288, 291 (2d Cir. 1961); United States v. Warsaw Elevator Co., 213 F.2d 517, 518–519 (2d Cir. 1954); United States v. Russell Electric, 250 F.Supp. 2, 20 (S.D.N.Y.1965), and Toolco failed to demonstrate TWA's financial capability to purchase substitute jets deliverable before 1963, or that any such jets were on the market. There is evidence in the record indicating that the lead time in the purchase of jet-powered aircraft, each of which is tailor-made in many respects for the specific customer, is several years. Finally, a holding, in the face of no evidence to the contrary offered by Toolco, that TWA was financially able in the time immediately after the transfer of control to restock its depleted fleet, would not be consonant with the allegation of ¶ 53(a) that Hughes's manipulations of TWA had left it financially debilitated.

B. *Lost Profits From Decreased Fleet Size*

 Toolco also attacks Wemple's testimony credited by the Special Master, that even if TWA had received all 63 jets, the additional 16 jets would have enjoyed a "load factor" (measure of the number of passengers carried on an average trip) equal to the average load factor for all jets of the same types during the years for which damages were assessed. Toolco's principal argument is that its own expert was correct in (1) considering the probable depressing effect on demand of introducing new jets into the commercial air flight market and (2) basing his estimates on TWA's specific records of profits for each of its separate jet routes.

But adding 16 planes to the market would have increased overall capacity of domestic American air carriers by only 3.7% at most. It is entirely reasonable to believe that TWA's new, modern jets would have attracted at least as many extra passengers to TWA as might have been lost because of the added capacity. Thus one does not have to strain to recognize that TWA's competitors would have borne a loss of passengers. In any event, the effect hypothesized by Toolco

is highly speculative and Toolco has not carried its burden of proof on this score.

Moreover, Toolco's approach of calculating the potential market for the lost planes only by looking at the capacity of each existing TWA route to absorb the new capacity is too rigid and the Master was not clearly in error to reject it. There is no reason to believe TWA could not have arranged its schedules to maximize its profits.

Finally, there is simply no sound reason to accept Simat's assumption that international competitors of TWA would have increased their transatlantic jet flights by four for each flight added by TWA. The Master was justified in rejecting this guesswork.

C. *Accounting Adjustments in the Price Waterhouse Study*

■ Toolco seeks to challenge certain adjustments made in the Price Waterhouse financial analysis, upon which both parties relied throughout the hearing to show the financial impact on TWA of various competing or alternative assumptions, some of which were ultimately resolved in favor of TWA, and some in favor of Toolco. Contrary to the claim in Toolco's reply brief, these adjustments were made by Price Waterhouse, not Beigler, who directed the study and testified concerning it. In Plaintiff's Exhibit 50, Biegler merely summarized the adjustments already made by Price Waterhouse and which were previously incorporated in its study. The exhibit included an index of references to the Price Waterhouse study that explained and justified each conclusion. Toolco raised no objections to any of these adjustments before the Special Master, although it had ample time to study the Price Waterhouse report prior to Brownell's decision and in the face of Judge Metzner's clearly expressed and entirely appropriate suggestion that any technical problems that might arise after Toolco had thoroughly scrutinized the report should first be referred to Brownell so that rebuttal evidence could be put in the record. Tool-

co's failure to do so is inexcusable, particularly in litigation as complex and difficult as this is. It is precluded from raising these issues now since its conduct has denied TWA an opportunity to submit its own evidence on these intricate accounting matters to the Special Master.

■ In any event, Brownell's acceptance of the adjustments relied on by both parties and to which no objections were made can hardly be assigned as plain error unless the defect is patent and obvious on the face of the report. We find none of the adjustments complained of clearly erroneous, and indeed most, if not all, seem clearly justified as reflecting reasonable accounting procedures.

VIII.

■ In its May 3, 1963 order entering the default judgment on TWA's complaint, as we have already noted, the district court also granted TWA's motion to increase the treble ad damnum from $105,000,000 to $135,000,000. Toolco assigns this as error under F.R.Civ. P. 54(c), which provides that "a judgment by default shall not * * * exceed in amount that prayed for in the demand for judgment." Although the authorities do not appear to be in agreement and this Circuit has not expressed itself on the question, we are of the view that there is no sound basis for restricting TWA to the precise damages originally sought in a case where damages alleged were unliquidated, and where defendant did not default by non-appearance, but rather because of non-compliance with discovery procedures, and indeed was granted a full trial on the question of damages actually caused by the allegations established by its default. See Riggs, Ferris & Geer v. Lillibridge, 316 F.2d 60, 62–63 (2d Cir. 1963); Sarlie v. E. L. Bruce Co., 265 F.Supp. 371 (S.D.N.Y.1967); 6 Moore, Federal Practice ¶¶ 54.61, 55.08 at 1206. Toolco cannot in good conscience complain of any unfairness or surprise, for, as we said in discussing the propriety of the default judgment, at no time has it sought to

rectify its refusal to cooperate with the legitimate discovery orders, an act it easily could have performed after Judge Metzner granted the motion to increase the ad damnum. Moreover, at the February 8 hearing, prior to Hughes's non-appearance, TWA clearly announced its intention to apply for an increase in the prayer for damages to the trebled $135 million.

## IX.

 Judge Metzner awarded attorneys fees to TWA of $7.5 million based on the time expenditure of 56,000 hours and taking into consideration many relevant factors which are each thoroughly discussed in his opinion, 312 F.Supp. 478. Toolco assigns the award as error largely on the basis that the hourly rate (about $128) is excessive, thus ignoring the unprecedented size of the judgment (the allowance for attorneys fees is less than 6% of the award of damages), the complexity of the proceedings, and the fact that the default judgment was the product of intensive pre-trial activity for two years and was followed by exhaustive appeals and intricate damages proceedings during which Toolco persistently attempted to undo the effects of its own default. In extraordinary litigation such as this, it would be artificial to fix an arbitrary hourly rate without regard to other relevant factors, for example, quality of the representation, the success achieved, and the size of the award. There are no exact formulations of which we are aware, that would require a precise maximum hourly fee to be fixed in a vacuum. Under all the circumstances, especially in view of Judge Metzner's meticulous discussion of the problem, we are unable to say that he exercised his broad discretion in this respect unreasonably. Montague & Co. v. Lowry, 193 U.S. 38, 48, 24 S.Ct. 307, 48 L.Ed. 608 (1904); Hanover Shoe, Inc. v. United Shoe Mach. Corp., 245 F.Supp. 258, 302 (M.D.Pa.1965), vacated on other grounds, 377 F.2d 776 (3d Cir. 1967), reversed in part on other grounds, 392

U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

## TWA's CROSS-APPEAL

The five points raised by TWA on its appeal do not call for more than summary discussion.

## X.

 Its only objection to Brownell's computation of damages is that he sensibly permitted a deduction from TWA's damages for the cost of capital that TWA would have incurred if it had independently purchased its 63-jet reconstructed fleet because of interest charges that TWA would have incurred if the necessary capital had been borrowed in 1958–59. The Special Master calculated a somewhat higher interest rate (6.3%) for the Convairs than for the Boeings (6%) because the Convairs under the reconstructed plan would have been delivered later than the Boeings. In arriving at a rate of 6.3%, the Master relied on average interest rates charged to other airlines for similar loans during this period, and indeed paid by TWA itself on its own comparable indebtedness during that period. The 6–6.3% rate is identical to that which TWA's expert Morehouse had computed in a portion of his rejected financing plan which contemplated some additional borrowing, in 1959, supplementing earlier financing in 1955 at lower rates.

In seeking a smaller deduction for interest costs, TWA relies on (1) its Exhibit No. 314, showing interest rates on debts outstanding to various airlines in 1960, but without regard to the times that the debts were incurred or the purposes for which they were incurred; (2) the rejected Comparative Profits Study; and (3) a Price-Waterhouse estimated financing charge premised on the rejected Morehouse report. For the reasons just indicated, each ground asserted is insufficient to establish that Special Master Brownell's adoption of the higher rate was clearly erroneous. In the absence of a viable alternative offered by

TWA (and TWA does not contest the rejection of the Morehouse and Comparative Profits studies) the Master properly based his deduction for interest charges on the price of money at the time when financing would normally have been arranged for the 63-jet fleet.

### XI.

■ TWA also argues that the interest allowances on the damage award and the judgment itself were incorrect.

TWA contends that it was improperly denied moratory interest as an element of "the damages sustained" by it under Clayton Act § 4, 15 U.S.C. § 15, to be computed from the time the damages were sustained and trebled to the date of judgment. We agree with the Seventh Circuit's contrary resolution of this issue in Locklin v. Day-Glo Color Corp., 429 F.2d 873, 877 (7th Cir. 1970), cert. denied, 400 U.S. 1020, 91 S.Ct. 584, 27 L.Ed.2d 632 (1971). It is reasonable to interpret Congress's silence on the matter as indicating that trebled damages are sufficient penalty and that interest need not be included. See Rodgers v. United States, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947). Moreover, trebled damages will more than adequately compensate TWA for its injuries. Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). Thus, there is no inherent policy reason to award moratory interest here and not doing so avoids difficult questions of proof —including highly abstruse inquiries as to proper rates and the time from which interest should run. Since the trebled damage device in any event adequately serves the penal and remedial purposes of the antitrust laws, we believe that it is sounder, absent contrary express Congressional intent, to consider that these difficult and time-consuming inquiries are intended to be avoided.

■ TWA also urges that interest on the judgment should run from the time the Master filed his report, rather than from the date of the district court's judgment, contrary to the apparently clear language of 28 U.S.C. § 1961, which speaks of an award of interest "from the date of the entry of the judgment" and applies by its terms to "any money judgment * * * recovered in a district court." TWA is not, as it attempts to show, "penalized" in any sense by any delay in judgment occasioned by the court's discretionary referral of the case to a Master. To the contrary, the salutary device of having the highly complex questions in this case heard and analyzed by a Master served to expedite this litigation. TWA cites no authority in point for its position [5] and we perceive no good reason to adopt its novel argument in the face of the plain words of Section 1961.

■ We do, however, agree with TWA that under New York law, applicable here pursuant to 28 U.S.C. § 1961 (interest on the judgment is calculated "at the rate allowed [on such judgments] by State law"), interest on the judgment should be at the rate of 7½% rather than the 6% allowed by Judge Metzner. Under N.Y.C.P.L.R. § 5004, interest on money judgments in New York "shall be at the legal rate." When this section was first adopted in 1963, it clearly referred to the rate then set as the maxi-

---

5. Tilghman v. Proctor, 125 U.S. 136, 8 S.Ct. 894, 31 L.Ed. 664 (1888), and other patent cases relied on by TWA do not involve the question of when interest begins to run on a judgment, but rather from when interest *as an element of damages* should be measured. The holding of the cases cited is that interest should run from the date that the fact and amount of damages cease to be "in earnest controversy and of uncertain issue," *id.*, at 161, 8 S.Ct. at 907, an event marked by the filing of the Master's report. Since we determine that moratory interest is inappropriate here, these cases are inapplicable. In L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 20 F.2d 830 (7th Cir. 1927), a trademark and unfair competition case, the question at issue was also the time from which interest would be assessed "as an element of damages." *Id.* at 836. See also Carter Products, Inc. v. Colgate-Palmolive Co., 214 F. Supp. 383, 417–418 (D.Md.1963).

mum allowable interest rate prescribed by Gen.Bus.Law, McKinney's Consol. Laws, c. 20, § 340 (6%). Section 340 was subsequently superseded by an identical provision codified as § 5–501(1) of the N.Y.Gen.Obl.Law, McKinney's Consol.Laws, c. 24–A. In 1968, that provision was amended to give the State Banking Board discretion to set the maximum rate of interest allowable on loans or their equivalent. The 6% rate was thereafter to prevail only if the Board prescribed no other maximum lending rate. In February, 1969 (the Court's judgment was filed in 1970), the Board prescribed a rate of 7½%.

Ever since the amendment to Section 5–501(1), there has been a lively controversy among New York courts and commentators as to which rate governs money judgments—6% or the rate set by the Board. The commentator to the C.P.L.R. argued persuasively in 1969 (see N.Y.C.P.L.R.1970 Supp. at 146–149) that the sounder view was that the Board's rate should prevail, since the purpose of C.P.L.R. § 5004 was to set interest on money judgments at the going rate at the time in New York State, and the purpose of amending Section 5–501(1) was to permit that rate to be responsive to changing economic conditions. The commentator saw no need for leaving the rate of interest on judgments rigid after the state had determined that for commercial purposes the rate should be more flexible.

We agree with this reasoning. Toolco relies on our contrary decision in Caldecott v. L. I. Lighting Co., 417 F.2d 994 (2d Cir. 1969), where we followed the tentative view of the then highest state court ruling on this question, Belcher v. Kesten, (Sup.Ct. Queens County, May 28, 1969), rev'd on other grounds, 36 A.D.2d 736, 320 N.Y.S.2d 610 (1971). Since Caldecott was decided by us, the Appellate Division, First Department, has unanimously held in Rachlin & Co. v. Tra-Mar, Inc., 33 A.D.2d 370, 308 N.Y.S. 2d 153 (March 5, 1970), that the 7½% rate should apply to a money judgment on a claim founded in contract. We see no sound basis for distinguishing contract from tort actions in fixing the appropriate rate of interest on a judgment and since *Rachlin* is presently the most authoritative declaration of New York law interpreting C.P.L.R. § 5004, we will modify the judgment of the district court and direct that interest run from the date of the judgment at the rate of 7½%.

### XII.

TWA's last contention is that it should be compensated for fees paid to its experts as part of its "cost of suit," 15 U.S.C. § 15. This precise issue has long since been decided contrary to TWA's position in this Circuit, Straus v. Victor Talking Machine Co., 297 F. 791 (1924) and TWA has not persuaded us that that decision, or the unanimous host of cases relying on *Straus* in this and other jurisdictions should be overruled. See e. g., Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190, 224 (9th Cir. 1964); Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir. 1961), cert. dismissed sub nom. Wade v. Union Carbide & Carbon Corp., 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed. 2d 46 (1962); Farmington Dowel Prods. Co. v. Forster Mfg. Co., 297 F.Supp. 924 (D.Me.), aff'd and remanded, 421 F.2d 61 (1st Cir. 1969).

The judgment is modified to allow 7½% interest on the judgment. In all other respects, the judgment of the district court is affirmed.