**FLM COLLISION PARTS, INC., Plaintiff,**

v.

**FORD MOTOR COMPANY and Ford Marketing Corporation, Defendants.**

**No. 73 Civ. 713.**

United States District Court, S. D. New York.

March 17, 1976.

---

Julien & Schlesinger, by Alfred S. Julien, Stuart A. Schlesinger, David Jaroslawicz, David L. Wasser, New York City, for plaintiff.

Sullivan & Cromwell, by Robert MacCrate, William M. Dallas, Jr., New York City, William A. Zolbert, Office of the Gen. Counsel, Dearborn, Mich., for defendants.

## SUPPLEMENTAL OPINION

GRIESA, District Judge.

On December 19, 1975 I filed an opinion holding that plaintiff FLM Collision Parts, Inc. is entitled to injunctive relief and damages under Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Anti-Discrimination Act, 15 U.S.C. § 13(a). I stated that a supplemental opinion would be issued on the amount of damages to be awarded following completion of the record on that subject.

The record is now complete. This supplemental opinion contains my findings of fact and conclusions of law as to the amount of damages, and also as to the amount of the attorneys' fee to be awarded pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

### Damages

There are five items of damages claimed by FLM which require specific discussion. Certain other damage claims have been made by FLM based upon its theories of Sherman Act violation. Since these Sherman Act theories were rejected in my earlier opinion on liability, I will not deal further with the related issues of damages.

### Wholesale Incentive Allowances

FLM claims that it should recover the total amount of the wholesale incentive allowances which were denied by Ford commencing November 1, 1972.

Ford, in its Post-Trial Brief (pp. 92–96), basically conceded that, if there were liability, FLM would be entitled to recover the amount of these wholesale incentive allowances, provided that such amounts were accurately proved. In further proceedings, Ford has advanced two contentions. Ford argues that there is no showing that the entire amount of these wholesale incentive allowances would have been "passed on" by the

Ford dealers to FLM. Ford also contends that the amount of the award for such allowances should be diminished by the alleged additional bookkeeping costs which FLM would have been required to incur in order to claim the wholesale incentive allowances.

FLM has accurately proved the amount of the wholesale incentive allowances which should have been granted on Ford crash parts purchased by it during the relevant period. This period runs from November 1, 1972 to early 1976, when the final evidence was being introduced on the subject of damages. For the sake of convenience, a reasonable cutoff date for the damage period was selected—February 6, 1976. I find that FLM has proved wholesale incentive allowances withheld in the total amount of $246,766.

■ I reject the contention that FLM has failed to show that the entire amount of these wholesale incentive allowances would have been passed on to FLM by the Ford dealers. Prior to the withdrawal by Ford of the wholesale incentive allowances on sales to FLM, these allowances were consistently passed on to FLM.[1] There is not the slightest reason to believe that this practice would not have continued had it not been for the action of Ford in halting the granting of the wholesale incentive allowances on crash parts sold to FLM.

■ I also find no merit in Ford's contention that the amount of the award for wholesale incentive allowances withheld should be diminished to take into account alleged additional bookkeeping costs. Ford points to the allegation of FLM that about $46,000 was spent on accounting services rendered to FLM *in the present litigation*. Ford assumes quite reasonably that some portion of this $46,000 relates to the detailed review of invoices and other records necessary to reconstruct the amount of wholesale incentive allowances which should have been granted during the period November 1, 1972 to February 6, 1976, and argues that this indicates that there would have been additional bookkeeping expenses to calculate the wholesale incentive allowances even if allowance claims had been handled in the normal course of business.

Ford's argument is unrealistic. There is a great difference between calculating wholesale incentive allowances in the normal course of business and reconstructing this calculation for the purpose of litigation. There is no sufficient indication that FLM would have incurred any appreciable additional expense in order to process the wholesale incentive allowance claims in normal course.

For these reasons I find that FLM is entitled to damages in the amount of $246,766 representing wholesale incentive allowances which should have been granted.

*Lost Sales*

■ FLM claims that its sales were consistently growing at a rapid rate until the time that Ford denied the wholesale incentive allowance, and that its sales would have continued to grow at the same rate during the years following the cutoff of the wholesale incentive allowance. FLM contends that this growth was prevented by Ford's wrongdoing, and that damages should be awarded based upon the alleged loss of growth.

I have concluded that this claim, as presented by FLM, is entirely too speculative to justify an award of damages.

However, FLM is entitled to damages on a related, but somewhat different, theory. As described in my earlier opinion, FLM's sales grew steadily for several years from its commencement of busi-

---

1. It is true, of course, that the Ford dealer supplying FLM with parts charged a markup of 3% during the time the wholesale incentive allowance was in effect for sales to FLM. The application of this 3% markup is described in my earlier opinion. However, there would be no justification for deducting the 3% markup from the damage award. FLM has *already* paid a markup to its supplying Ford dealers on the parts on which the damage award is calculated. Indeed the markup has been 5%.

ness in 1965. During the fiscal year ending September 30, 1972—the last full fiscal year prior to the withdrawal of the wholesale incentive allowance—FLM's sales were $736,967. The wholesale incentive allowance was cut off about November 1, 1972.

The economic effects of this cutoff were felt by FLM in stages. FLM was able to continue its growth in sales in fiscal 1973. The sales for that year were $798,947. However, the severe cut in FLM's profit margin produced a net loss of $85,707.

Prior to 1974 both FLM and the franchised Ford dealers with whom FLM competed in the sale of crash parts generally sold these parts to the independent repair shops at a 25% discount off the suggested retail price. Commencing in 1974 three of FLM's competitors—Empire Ford in Mt. Vernon, Ruckle Ford in Yonkers, and W. H. Jackson Ford Sales in Ossining—commenced granting substantially larger discounts than 25%. Since FLM, unlike its Ford dealer competitors, did not have the benefit of the wholesale incentive allowance, FLM could not afford to meet this price competition. FLM was also, by this time, experiencing a serious shortage of working capital. These conditions cut substantially into FLM's sales.

FLM's sales for fiscal 1974 were $695,188—down approximately $100,000 from the 1973 level. The basic adverse effect on FLM's sales volume continued after fiscal 1974, although sales in *dollar* terms rose above the 1974 level because of price inflation. Sales for fiscal 1975 were $722,681. Sales for the period October 1975 through February 6, 1976 were $301,803.

FLM has made a careful calculation, in dollar terms, of the net loss of sales commencing in fiscal 1974 and running to February 6, 1976 based upon a comparison with the level of 1973 sales. The

total net loss of sales under this calculation is $169,456.[2] FLM has also made a calculation of the amount of net profit which FLM would have earned on the basis of this $169,456, assuming among other things that the wholesale incentive allowance would have been granted with respect to parts purchased. FLM's accounting methods in these calculations appear satisfactory, and are unchallenged by any convincing testimony or argument. Such net profit is $44,736, to which FLM is entitled as damages.

*Increased Markup by Dealers*

█ FLM claims that Ford's denial of the wholesale incentive allowance disrupted FLM's business relations with its then supplier of crash parts, Atlas Lincoln-Mercury. FLM claims that its subsequent suppliers have charged a 5% markup, instead of the 3% markup charged by Atlas. FLM claims the 2% differential as damages.

It is certainly true that Ford withdrew the wholesale incentive allowance on sales to FLM and that shortly thereafter FLM ceased doing business with Atlas, and commenced obtaining its supplies of crash parts from other Ford dealers. However, there is no sufficient showing that Ford's actions were the proximate cause of the termination of FLM's business dealings with Atlas. There is no indication that Ford prevented FLM and Atlas from negotiating to continue business after the withdrawal of the wholesale incentive allowance. Ford certainly did not prevent FLM from purchasing from *other* Ford dealers. As to the amount of markup charged by these other dealers, this was strictly a matter of negotiation between FLM and such dealers. Ford is not liable for this item of damages.

*Obsolescence Credit*

█ FLM claims that Atlas permitted FLM to obtain half of a 5% obsolescence

---

2. This takes into account that, in dollar terms, the sales for the period October 1975 through February 6, 1976 ($301,803) were actually greater than pro rated sales at the 1973 level

for the same period ($274,758). Ford is given credit for this in the overall calculation despite the fact that the increased dollar volume was due to price inflation.

credit allowed by Ford on crash parts. FLM claims that the subsequent suppliers have not permitted FLM to obtain any part of this credit, and that damages should be awarded for this alleged loss.

There is no evidence to indicate that Ford had anything to do with certain Ford dealers denying FLM the benefit of obsolescence credits. Ford is not liable for this item of damages.

### Loss of Good Will

■ FLM contends that the "good will" value of its business has been destroyed, and seeks damages for this loss.

By good will, FLM refers to what a buyer would pay for the business as a going concern. FLM claims its business had a value of about $1 million prior to Ford's withdrawal of the wholesale incentive allowance. FLM contends that the value of its business has been entirely destroyed "since no purchaser will pay for that business knowing that the defendants are seeking for a way to prevent the plaintiff from continuing in business" (Plaintiff's Post-Trial Brief p. 69). This theory of damages is inappropriate in the present case. The wrongdoing of Ford will be the subject of injunctive relief. Plaintiff's expert witness admitted that the possibility of injunctive relief would affect his opinion regarding the destruction of FLM's good will value. He further admitted that he had not taken such possibility into account in making his calculation. I conclude that FLM is not entitled to this item of damages.

### Summary Regarding Damages

FLM has proved damages in the amount of $246,766 representing wholesale incentive allowances withheld on parts purchased commencing November 1, 1972. FLM has proved damages in the amount of $44,736, representing the net profit FLM would have earned on sales lost due to the wrongful acts of Ford. The total of these two amounts is $291,502. FLM is entitled to recover treble this amount, or $874,506.

### Attorneys' Fees

FLM's attorneys—David L. Wasser, Esq. and the firm of Julien & Schlesinger—apply for an award of attorneys' fees in the total amount of $425,000. Application is also made for payment to Mr. Wasser of an additional $36,500 to cover accounting services rendered by him. In addition, payment of $10,350 is sought for two other accountants—Morris Israel and Jack Brand. Finally, FLM seeks to have costs of the action taxed in the amount of $1300.90.

When the controversy between FLM and Ford originally arose, FLM was represented by Wasser, who was both the accountant and attorney for FLM. Commencing in the fall of 1972, Wasser complained to Ford about its conduct, had discussions with representatives of the Federal Trade Commission, and prepared the complaint in this action, which was filed in February 1973. Wasser presented a motion for preliminary injunction against Ford which was withdrawn in March 1974.

In July 1974 the firm of Julien & Schlesinger was brought into the case. Thereafter, Wasser and Julien & Schlesinger worked together on discovery and the trial of the case.

The case involved a relatively small amount of discovery followed by a seven-day trial in late September and early October 1974. There was extensive briefing on the difficult legal issues in the case before, during and after the trial. Following the original opinion of the court on liability, filed December 19, 1975, there were further hearings on damages February 9 and March 2, 1976.

■ The method to be used in calculating attorneys' fees is to start with the amount of time the attorneys have expended on the case, and to value that time by applying the hourly rate which attorneys of like skill in the area would typically be entitled to. After this calculation is made, adjustment should be made for such factors as the magnitude and complexity of the litigation, the amount recovered and litigation risks.

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974).

Wasser states that he spent 1277 hours on legal work, as distinct from accounting work. Wasser uses a rate of $100 per hour, producing a total dollar figure of $127,700. The firm of Julien & Schlesinger represents that the time spent and appropriate billing rates were as follows:

Alfred S. Julien — — senior partner — —

 197 hours — — $200 per hour — — total $39,400

Stuart A. Schlesinger — — junior partner — —

 268 hours — — $125 per hour — — total $33,500

David Jaroslawicz — — senior associate — —

 362 hours — — $65 per hour — — total $23,530.

The total of this time for Julien & Schlesinger is 827 hours, and the total dollar amount is $96,430.

The total time claimed to have been spent by Wasser and Julien & Schlesinger on legal work for the case is 2104 hours, and the total of the dollar amounts shown above for all the lawyers is $224,130.

There are several difficulties with these calculations. In the first place, neither Wasser nor any of the attorneys at Julien & Schlesinger maintained time records. It is nothing short of amazing that this should be so, in view of the warnings issued by our Court of Appeals in analogous cases. *In re Borgenricht,* 470 F.2d 283, 284 (2d Cir. 1972); *In re Hudson & Manhattan R. R.,* 339 F.2d 114, 115 (2d Cir. 1964). Also, the decision in *City of Detroit v. Grinnell Corp., supra,* which emphasized the importance of the attorneys' time calculations in connection with antitrust fee applications, was handed down on March 13, 1974. This was four months before Julien & Schlesinger were retained in the present case.

■ Another problem is that, under the applicable law, no award of attorneys' fees can be made under Section 4 of the Clayton Act except for services related to the successful recovery of treble damages under that section. In other words, no award can be made under the statute for work devoted exclusively to the pursuit of injunctive relief or of unsuccessful theories of liability. *Decorative Stone Co. v. Bldg. Trades Council,* 23 F.2d 426 (2d Cir.), *cert. denied,* 277 U.S. 594, 48 S.Ct. 530, 72 L.Ed. 1005 (1928); *Trans World Airlines, Inc. v. Hughes,* 312 F.Supp. 478, 482–83 (S.D.N.Y.1970), *aff'd,* 449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

■ Applying this rule to the present case, it is clear that the time spent by Wasser in complaining to Ford, in having discussions with the Federal Trade Commission and in presenting the motion for preliminary injunction cannot be the basis for recovery of a fee award. Moreover, time spent by either Wasser or Julien & Schlesinger in pursuing the unsuccessful Sherman Act claims and in drafting the permanent injunction cannot be the basis for a fee award. I am now speaking of efforts devoted *solely* to these activities—activities which did not also relate to the successful Robinson-Patman Act damage claims. To the extent that work was carried out which bore upon *both* the Robinson-Patman Act damage claims and upon requests for injunctive relief and other theories of recovery, there can be an award of attorneys' fees under the statute. *Trans World Airlines, Inc. v. Hughes,* 312 F.Supp. at 483.

■ Another problem is that, to the extent that there was duplication of effort as between Wasser and Julien & Schlesinger, the fee award must be reduced. *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 1975–2 Trade Cas. ¶ 60,-551 (S.D.N.Y.1975).

The task of sorting out what time related to recoverable items and what time related to non-recoverable items is obviously made more difficult than it should be because of the failure of the attorneys to keep time records. However, there is no alternative but to make reasonable estimates on the basis of available information.

I am compelled to disallow most of the time claimed to have been spent by Wasser on legal services.

Wasser asserts that he spent 280 hours through the time the complaint was filed. He conferred with his client, with Ford's counsel and with the Federal Trade Commission. He performed legal research and drafted the complaint. It is clear that out of this 280 hours the only recoverable time is that which was spent on factual investigation and legal research leading up to the commencement of this action, and also time spent on drafting the complaint. I will allow only 100 out of the 280 hours.

Wasser asserts that he spent 335 hours in connection with the application for preliminary injunction. There is no basis for allowing any of this time.

Wasser claims that 409 hours were spent on "Discovery and Trial Preparation." I conclude that almost all of this time was a duplication of work done by Julien & Schlesinger. The one item which was not duplicative was Wasser's preparation of interrogatories prior to the retention of Julien & Schlesinger. I will allow 75 out of the 409 hours.

Wasser claims a total of 253 hours for time spent at the trial and in post-trial activities. I conclude that the great bulk of this time was either a duplication of the work of Julien & Schlesinger or was work in Wasser's capacity as an accountant and expert witness. The cost of these services is not recoverable as attorneys' fees or costs under Section 4 of the Clayton Act. *Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 81 (2d Cir. 1971), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577; *Twentieth Century Fox Film Corp. v. Goldwyn,* 328 F.2d 190, 224 (9th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964). I will allow only 50 out of the 253 hours.

The total amount of time allowed for Wasser is 225 hours. As to Wasser's hourly rate, I find no reason to challenge his figure of $100. Applying this rate to the 225 hours, gives a total of $22,500.

As to the time spent by Julien & Schlesinger, the estimate of 827 hours for the three lawyers involved is not unreasonable, although it would have been far more satisfactory to have actual time records. The problem comes in attempting to calculate the time spent on compensable items versus the time spent on noncompensable items. The principal items in the latter category would relate to the unsuccessful Sherman Act claims. On this point I am concerned primarily with legal research and legal briefing, since the preparation and presentation of evidence in the case related both to the Sherman Act claims and to the successful Robinson-Patman Act damage claims. I am excluding 20 hours for Julien, 40 hours for Schlesinger, and 80 hours for Jaroslawicz in connection with briefing of Sherman Act claims. A certain amount of time must also be excluded for work on the final injunction. In this regard, I am deducting 2 hours for Julien and 5 hours for Schlesinger. This gives net totals for the three attorneys from Julien & Schlesinger as follows:

| | |
|---|---|
| Julien | 175 hours |
| Schlesinger | 223 hours |
| Jaroslawicz | 282 hours |

With respect to the hourly rate to be applied, Julien & Schlesinger reported to the Court that the rates for the three attorneys respectively, charged in matters billed by the hour, were $200, $125, and $65. I find that the appropriate hourly rates are $135, $100, and $65.

Applying these rates to the number of hours spent by the attorneys at Julien & Schlesinger gives a total amount of $64,-255. Adding this to the $22,500 for Wasser gives a total of $86,755.

A fee somewhat above this amount is appropriate. The litigation was attended with numerous difficulties and risks. There was no assistance from any prior governmental proceeding. *See City of Detroit v. Grinnel Corp.,* 495 F.2d 448, 470–71 (2d Cir. 1974). Under all the circumstances, I am awarding attorneys' fees in the amount of $135,000.

The application for fees for accounting work of Israel and Brand is denied. *Twentieth Century Fox Film Corp. v. Goldwyn,* 328 F.2d 190, 224 (9th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 143,

13 L.Ed.2d 87 (1964); *see Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 81 (2d Cir. 1971), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577; *Straus v. Victor Talking Machine Co.,* 297 F. 791 (2d Cir. 1924).

Costs will be taxed by the Clerk of the Court in the normal manner.

### Conclusion

FLM is entitled to judgment in the amount of $874,506 plus attorneys' fees in the amount of $135,000, together with costs to be taxed by the Clerk of the Court.

A judgment and final injunction will be signed and filed today.