Petra WILLIAMS, Individually and as a shareholder of the Schatz Manufacturing Company, suing on behalf of herself and all other shareholders of the Schatz Manufacturing Company, similarly situated and in the right of the Schatz Manufacturing Company, Plaintiff,

v.

The SCHATZ MANUFACTURING COMPANY, George R. Bennett, Jr., James E. Neighbors, Jr., Frederick W. Recknagel and "John Doe", Defendants.

Petra WILLIAMS, Individually and as a shareholder of the Federal Bearings Co., Inc., suing on behalf of herself and all other shareholders of the Federal Bearings Co., Inc., similarly situated and in the right of the Federal Bearings Co., Inc., Plaintiff,

v.

The FEDERAL BEARINGS CO., INC., George R. Bennett, Jr., James E. Neighbors, Jr., Dan G. Fichter, Frederick W. Recknagel, Ernestine S. Neighbors, John W. Bahret, Jr., "John Doe" and "Richard Roe", Defendants.

Nos. 68 Civ. 2277 and 68 Civ. 2276.

United States District Court,
S. D. New York.

April 29, 1977.

Benedict Ginsberg, New York City, for plaintiff.

John N. Cole, Stamford, Conn., for defendants George R. Bennett, Jr., James E. Neighbors, Jr., and Frederick W. Recknagel.

Robert B. Van DeWater, Van DeWater & Van DeWater, Poughkeepsie, N. Y., for defendant The Federal Bearings Co., Inc.

Russell E. Aldrich, Aldrich & MacDonald, Poughkeepsie, N. Y., for defendant Dan G. Fichter.

## OPINION

SOLOMON, Senior District Judge, Sitting by Designation:

Plaintiff, Petra Williams, individually and as a shareholder of The Federal Bearings Co., Inc. (Federal) and The Schatz Manufacturing Company (Schatz), filed actions against these two corporations and against certain of their officers and directors to require them to distribute substantial portions of the corporations' accumulated surpluses to the shareholders and to repay to the corporations excess compensation these officers and directors received from 1963 to 1968.

Federal was organized by three brothers, all of whom died before these actions were filed. There are 9,595 shares of stock in Federal which are outstanding. Plaintiff owns 1,328 shares, and 6,437 shares are owned by other descendants of the founders or trusts for the benefit of the descendants. Only 1,830 shares are owned by outside parties.

There are 3,380 shares of Schatz common and preferred stock. Plaintiff owns 332 shares, Federal owns 1,629, and the other 1,419 are either owned by relatives of the founders or are in the names of estates or trusts for the benefit of those relatives. James E. Neighbors, Jr., is the legal or beneficial owner of one-sixth of all of the stock, and it is anticipated that he will later acquire as much as one-fourth of the stock. His sister owns an equal amount.

For a number of years before plaintiff filed these actions, she was concerned about the activities of the trustees and their sale of the stock of Federal and Schatz without having first offered the stock to her. She had other grievances. She was dissatisfied with the size of the dividends and thought that much of the accumulated surpluses should be distributed to the stockholders.

In October 1966, she consulted Edwin Cohen, an attorney in Louisville, Kentucky. His records reveal that he researched the law and made other inquiries about her complaints. Some time later, Mr. Cohen and other attorneys who became associated with Mr. Cohen investigated the salaries that were paid officers and directors, many of whom were related to plaintiff and all or most of whom owned less stock than she did. Plaintiff was not on the payroll of either corporation.

Both before and after these actions were filed, plaintiff had frequent doubts about the desirability of continuing these cases. The record shows that Mr. Cohen spent many hours reassuring her.

More than a year after Mr. Cohen undertook to represent plaintiff, he concluded that the cases should be filed in New York and that he should associate himself with a New York lawyer. At first Cohen wrote to, and later went to see, a well-known New York lawyer who specializes in plaintiffs' cases. This lawyer refused to participate in the cases.

Later, Cohen succeeded in getting Benedict Ginsberg to join him in the prosecution of the cases. Mr. Ginsberg handles commercial cases primarily. He had never handled a minority stockholder action.

In May 1968, plaintiff, with Mr. Ginsberg and Mr. Cohen as her attorneys, filed two actions—one against Federal and some of

its directors, and the other against Schatz and some of its directors. Both complaints were simple and similar. They sought a return of excess compensation paid to or for the named directors, and in separate counts asked for the distribution in dividends of accumulated surpluses.

Mr. Ginsberg recently estimated that he and the associates in his office (not Mr. Cohen) spent 83 hours in the research and preparation of these two complaints and the minor amendments made to them. Mr. Ginsberg estimated that he personally spent 48 hours in this endeavor.

In late 1968, the depositions of Bennett, Bahret, Recknagel, and Ernestine Neighbors were taken. In 1969, the depositions of James Neighbors, Jr., and Fichter were taken. The deposition of Bennett was the longest; it was 134 pages. The other five depositions combined totaled 184 pages.

Mr. Ginsberg estimated that he spent 94 hours preparing for and taking these depositions and that members of his office spent 67 hours, or a total of 161 hours.

In February 1971, the parties filed pretrial orders, which recited that on April 17 and again on December 9, 1970, the attorneys appeared before the court and agreed that:

1. The actions complain only of acts committed by the defendants within six years prior to the service of the complaints; and

2. The fictitious defendants named in the complaints would be deleted.

Plaintiff in the pretrial order added the following contentions:

1. The defendants succeeded in controlling the corporations through personal stock ownership and the ownership by trusts which the individual defendants controlled;

2. The defendants paid themselves excessive amounts as salaries, bonuses and benefits;

3. Excessive earnings were retained, and the surplus so created might subject the corporations to penalties under the Internal Revenue Code; and

4. The financial status of the corporations demanded the declaration of greater dividends.

The so-called "amendments" added little, if anything, to the complaints.

The defendants, in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York, set forth with great specificity the grounds upon which they sought to defeat plaintiff's claims.

For his efforts in connection with these pretrial hearings, Mr. Ginsberg seeks compensation for 83 hours for himself and 55 hours for the two associates in his office.

In December 1972, plaintiff submitted a partial set of proposed findings. In the Schatz case, the proposed findings were three pages long and consisted of 10 items of undisputed facts which described the parties and set forth the amounts of common and preferred stock which each of them owned.

Defendants submitted their proposed findings of fact. They were 79 pages long and consisted of 85 separate items. Defendants' proposed findings complied with the federal and local rules and set forth defendants' theory of the case.

In September 1974, these cases were assigned to me for trial. I held short conferences with counsel on two occasions before trial: Sept. 20 and Oct. 11.[1] I attempted to narrow the issues and determine what evidence would be introduced at the trial.

When I learned that plaintiff's case in chief would consist of the testimony of adverse witnesses, exhibits and two experts, I suggested that, in lieu of testimony, the parties consider offering the depositions previously taken. All counsel agreed subject to their right to ask additional questions at the trial if they so desired. All

---

1. Mr. Ginsberg's reconstructed time records show a conference with me on Sept. 30. My records do not show it.

counsel further agreed that they would purge each deposition; that is, they would delete all irrelevancies and only underline those portions of the depositions that at least one of the attorneys believed to be relevant. The attorneys also agreed to submit summaries of the testimony of the witnesses not covered by the depositions.

I assume that all of this work was included under the classification "Pre-Trial Hearings", for which Mr. Ginsberg seeks to charge for 83 hours for himself and 55 hours for the associates in his office.

The trial was held 25 days after the first pretrial. At the trial, depositions were admitted, and the summaries of witnesses' statements were also read after certain deletions. Most of the exhibits were admitted without objection. Plaintiff called Petra Williams in the case in chief. Her direct testimony took three pages. I asked questions, and her testimony in response to my questions took two and one-half pages; and the cross-examination by defendants took less than one page. The direct testimony of Bennett on plaintiff's case in chief took 40 pages, and I considered the short summary of his testimony prepared by Mr. Cole. The complete oral testimony of Skydell consisted of 76 pages. This was in addition to the written statement submitted by the plaintiff. The case took less than two days to try, and the transcript of the testimony was 208 pages.

Thereafter, briefs were filed. Plaintiff filed a brief consisting of 10 pages, most of which were summaries of appellate court cases. The defendants filed a brief consisting of 53 pages, and the plaintiff replied in a 34-page brief. It answered defendants' contentions on proxies and on eight factual observations which it labeled "inappropriate". It also had a short section with excerpts from four cases cited by defendants which plaintiff asserts are "inapposite to the contentions they are offered to support."

In a written opinion:

I denied plaintiff any recovery by reason of the directors' decision not to distribute any more of its earned surpluses through dividends;

I denied plaintiff any recovery against defendants James E. Neighbors, Jr., Recknagel, Ernestine S. Neighbors, and Bahret because the plaintiff had failed to prove that the salaries were so unreasonably high as to justify a finding that they acted in their own self-interest and in derogation of the rights of the minority stockholders;

I granted recovery against Bennett and Fichter only. I granted Federal $100,000.00 against Bennett and $95,450.00 against Fichter. I granted Schatz judgment against Bennett for $90,800.00, and had originally granted Schatz a judgment against Fichter for $15,450.00, but I set it aside when I discovered that plaintiff had neglected to join Fichter as a defendant in the Schatz action.

The total amount of plaintiff's recovery against both Federal and Schatz was $286,250.00 plus interest of approximately $200,000.00.

Plaintiff's counsel are entitled to reasonable and even generous attorneys' fees for the preparation and presentation of these actions, which fees shall be paid out of the amounts awarded.

Plaintiff's counsel assert that the Court should consider the following factors in determining fees:

1. the amount recovered;
2. the time spent;
3. the risk assumed;
4. the complexity of the litigation; and
5. the skill, experience, and the standing at the bar of counsel.

Mr. Ginsberg, for himself and associates in his office, requests attorneys' fees of $150,000.00, and co-counsel Mr. Cohen requests $50,000.00. In addition, Mr. Ginsberg seeks $1,007.32 for reimbursement of out-of-pocket expenses. Mr. Cohen seeks $10,150.07, of which $5,325.00 is for the services of a C.P.A. Little or none of these C.P.A. services related to the claim for the recovery of excessive salaries, and probably little of these C.P.A. services related to any claim asserted in either action. The reim-

bursements claim also includes the traveling expenses of Mr. Cohen and plaintiff, Petra Williams, to New York to attend the pretrial conferences and trial.

In addition, Mr. Ginsberg seeks $11,880.00 in fees for Harry Skydell, C.P.A., who was plaintiff's principal witness.

In other words, plaintiff's counsel seek attorneys' fees and expenses of $224,349.39 for a recovery of $286,250.00 without interest.

Plaintiff's counsel further assert that based on the factors heretofore set forth, the amount which they request is what corporate defendants "would have had to pay."

■ I accept these factors as the proper criteria for determining fees, but do not agree that the amounts requested are fair or that the manner in which these amounts were arrived at are proper.

### The Amount Recovered

■ I agree that the amount recovered is one factor to be considered in determining attorneys' fees, but except in unusual circumstances it should not be the most important factor. It would be difficult to justify $200,000.00 in fees and $23,000.00 in expenses on a principal recovery of $286,-250.00 under any circumstances. I recognize that the corporations, and not the plaintiff, Petra Williams, individually, will be the principal beneficiaries of the recovery. Even if Petra Williams will eventually get some benefit from the judgment, most of the benefit will go to other stockholders, many of whom are the defendants in these cases.

### The Time Spent

■ I agree that the starting point of every fee award is the amount of time spent.

(a) How much time was actually spent?

Mr. Ginsberg asserts that he spent 332 hours and his associates Mr. Ramos 235 hours, Mr. Teichman 56 hours, and Mr. Mittleman 25 hours. Mr. Cohen asserts that he spent in excess of 1,000 hours.

Although Mr. Cohen kept better records than Mr. Ginsberg, Mr. Cohen's records were inadequate. Practically all of the entries were based on estimates made as long as eight years after the work was done. In my view, most of Mr. Ginsberg's estimates and many of Mr. Cohen's were grossly overestimated.

For example, Mr. Ginsberg seeks compensation for 83 hours for the preparation of two simple complaints. I recognize that Mr. Ginsberg, and probably his associates, had no experience in this field, but I am confident that any ordinary lawyer without experience in the field could complete the preliminary research and prepare complaints which were at least as good as these that were filed and in less than one-half of the estimated time claimed by plaintiff's counsel.

I am equally as confident that there was no need for spending 160 hours to take the depositions of some of the defendants. I have read each of these depositions, all of which were offered in evidence in lieu of the testimony of these witnesses, and I believe that they leave much to be desired from plaintiff's point of view.

I have already described plaintiff's contribution to the pretrial order. The estimate of 138 hours for the work that I saw is grossly overestimated. So are the estimates of 157 hours for preparation and 88 hours for a trial which lasted less than 7 hours and covered parts of two days. The evidence adduced on behalf of plaintiff consisted of exhibits, two or three live witnesses, and either summaries or portions of depositions of the defendants, most of which were introduced without objection.

■ In addition to grossly overestimating the time, I believe that a great amount of the actual time spent before the trial was not relevant to the issue of whether directors of the corporations paid themselves or used their positions to pay other officers or directors excessive salaries. As Judge Pollack, in *Vandervelde v. Put and Call Brokers and Dealers Ass'n.*, 344 F.Supp. 157, 160 (S.D.N.Y.1972), stated:

"The fee awarded should not include compensation for time expended upon theories of liability or overdrawn items of damage ultimately rejected by the trier of fact."

See also *Wall Products Co. v. National Gypsum Co.*, 367 F.Supp. 972 (N.D.Cal.1973).

Most of the evidence related to the two claims which dealt with the improper accumulation of surpluses and the wilful failure to distribute adequate dividends.

Also significant is the nature of the work performed by Mr. Cohen from October 1966 to March 18, 1968. His records show that much of that time was spent on claims other than those made in the complaint. Most of his early work dealt with the liability of the trustees for the sale of stock. Later, his work related to a proposed distribution of stock and an increase in the dividends. Cohen's records reveal that the first time he did any work on the excessive compensation claim was on February 14, 1969, and that within the next few days he spent 33 hours researching the subject.

I recognize that it is difficult, and usually impossible, to confine discovery and legal research to the precise issues raised in a legal proceeding. But I do not believe that an attorney who is retained by a client to protest the sale of stock by trustees is entitled to billable time in a class action brought to collect excessive compensation from the officers of the corporations which issued the stock.

The time records of Mr. Cohen also show that over a period of eight years he visited with Mrs. Williams on many occasions. Mr. Cohen states that he made these visits "not only for the purpose of preparation and review of the files but also to maintain her confidence and morale in this cause during the protracted terms of this litigation." Mr. Cohen usually estimated four hours of billable time for each visit with Petra Williams. At $50.00 an hour, the charge for each of such visits would be $200.00.

### Risk Assumed

Both Mr. Cohen and Mr. Ginsberg were well aware of the risk that they were taking when they agreed to represent plaintiff in these class actions. They hoped to recover not only on plaintiff's claims that excessive salaries were being paid, but also on plaintiff's claims that the corporations had amassed excessive surpluses which should have been distributed to the stockholders. They knew that they would be compensated only if plaintiff prevailed. They also knew that if plaintiff elected not to continue with the litigation, they probably would have to drop the cases for lack of a plaintiff. Perhaps that was the principal reason Mr. Cohen found it desirable to visit plaintiff on so many occasions.

In spite of these risks, Mr. Ginsberg and Mr. Cohen and their associates should have realized that their fees, even if they were successful, must be reasonable.

### Complexity of the Litigation

Mr. Ginsberg's discussion of the issue of complexity (and novelty) of the two actions is limited to the statement, "The supporting affidavits of Benedict Ginsberg and Edwin Cohen outline the many complex issues posed by this action."

I have examined these affidavits, and I fail to find either an outline or a discussion of the nature of any complex or novel issues of fact or law. I also examined the files in both actions, and I fail to find those issues.

### Skill, Experience and Standing at the Bar

Under this heading, Mr. Ginsberg's discussion is limited to the statement "[t]he skill, experience and standing of plaintiff's counsel is another factor to be considered in the fee award, *Grinnell, supra*, p. 470."

In his affidavit, under the heading, "Billing rates on non-contingency matters", Mr. Ginsberg asserts that he has acted as a referee by appointment of various judges of the state Supreme Court and that he has practiced continuously, primarily in litigated matters, since his admission in 1931, except for his war service during World War II. He also asserts that he does not have a fixed or static per hour charge; his charges are "based upon the nature, size, complexity

of the matters involved, and the results achieved." He believes that on a non-contingency basis his charges range from $60 to $250 an hour based on the circumstances of the case. He concludes that if he had billed on a non-contingency basis, he would have billed at a minimum of $200.00 an hour for his own time and lesser amounts for the associates in his office.[2]

In another section of his brief, Mr. Ginsberg said:

"The present fee applications is, as the supporting affidavits make plain, one where applicant's 'imagination, hard work, experience and skill have built the house from the very foundation'. We have done so in an adversary litigation fraught with risks and hazards."

Mr. Ginsberg may have displayed these attributes in his application for fees, but neither he nor his co-counsel have met these standards in the presentation of plaintiff's claims.

Mr. Skydell, the C.P.A. who was plaintiff's principal witness, seeks compensation of $11,880.00 for 184 hours of service which he and his associates performed. There are no time records, but merely a summary of total hours spent on a number of subdivisions which do not specifically refer to the nature of the research or services performed. It is impossible to tell, from either the affidavit or the summary, what problems they worked on or the amount of time that was spent on the issue of excess compensation as compared to other issues in the case. Mr. Erskine, the other C.P.A., spent little if any time on any issue litigated in these actions.

### Conclusion

■ The problem is the amount of attorneys' fees and expenses that should be allowed counsel for the prevailing party in these class actions on behalf of the stockholders of two corporations:

1. When the principal recovery without interest was $286,250.00;

2. When the hours claimed by counsel were grossly exaggerated, and

a. When much of the time spent was not relevant to any issue in the case;

b. When a substantial amount of time was devoted to the investigation and presentation of claims upon which there was no recovery;

3. When the issues of fact and law were neither novel nor complex; and

4. When the level of performance was no better than average.

The lack of adequate time records requires that I estimate the amount of compensable time which counsel and their expert witnesses devoted to these cases and the amount of expenses for which they should be reimbursed.

In my view, a reasonable and even generous award for attorneys' fees for Mr. Ginsberg and the associates in his office and for the expenses they incurred, including the fees of the Skydell office, is $37,500.00; and a reasonable award for Mr. Cohen for attorneys' fees and expenses (including the fees of Mr. Erskine) is $12,500.00.

An order may be entered in accordance with this opinion.

---

2. Among the associates was Charles E. Ramos, for whom Mr. Ginsberg asks a minimum of $14,625.00 for services in these actions. Mr. Ramos acknowledged Mr. Ginsberg's signature on the affidavit for attorneys' fees. He did this in spite of the relationship between Mr. Ginsberg and Mr. Ramos and the frequently announced rule "that it is unwise and contrary to public policy for an officer to take an acknowledgment to any instrument to which he is a party, or in which he is interested directly or indirectly." 1 Am.Jur.2d *Acknowledgments* § 16 (1962).