In re INVESTORS FUNDING CORPORATION OF NEW YORK SECURITIES LITIGATION.

Robert MORSE and Claire S. Morse, Individually and as Trustees, Plaintiffs,

v.

PEAT, MARWICK, MITCHELL & CO. et al., Defendants.

Rachel L. ROTHCHILD, Plaintiff,

v.

Jerome DANSKER et al., Defendants.

Morris KATZ et al., Plaintiffs,

v.

Jerome DANSKER et al., Defendants.

Dr. Bernard METRICK and Bernard Metrick, as custodian for Zachary Metrick, Plaintiffs,

v.

Jerome DANSKER et al., Defendants.

David HABER and Ruth Haber, Plaintiffs,

v.

Jerome DANSKER et al., Defendants.

MDL No. 290 (WCC).

Nos. 75 Civ. 3681 (WCC), 77 Civ. 616 (WCC), 76 Civ. 4721 (WCC), 78 Civ. 268 (WCC) and 78 Civ. 532 (WCC).

United States District Court, S. D. New York.

March 17, 1981.

## OPINION AND ORDER

CONNER, District Judge:

On March 6, 1981, following a hearing, this Court entered an Order granting final approval to partial settlements in these consolidated class actions. This Opinion and Order follows.

## BACKGROUND

This multidistrict litigation arises out of the financial demise of Investors Funding Corporation of New York ("IFC"), which petitioned for reorganization under the Federal Bankruptcy Act on October 21, 1974. Each of the five above-captioned cases is a purported class action on behalf of either IFC shareholders or purchasers of IFC debentures, and each names a multitude of defendants having various connections with IFC during the years immediately preceding its collapse.

Among the named defendants are:

(1) Republic National Life Insurance Company, Chase Manhattan Bank, N.A., Chemical Bank, Citibank, N.A., Barclays Bank of New York, Federal Deposit Insurance Corporation, as receiver for Franklin National Bank, Israel Discount Bank, Ltd., National Bank of North America, Sterling National Bank & Trust Company of New York, Union Bank, Hambros Bank Limited and the Trust Company of New Jersey ("the Banks" [1]). The Banks, lenders to IFC,

---

1. Hereafter "the Banks" also includes First National Bank of Chicago, Riggs National Bank of Washington, D. C. and Virginia National Bank. While these entities are not named as defend-

are alleged to have known or recklessly disregarded facts putting them on notice that IFC was in precarious financial condition and to have arranged for the conversion of their unsecured loans to secured loans while concealing IFC's actual insolvency; and

(2) Peat, Marwick, Mitchell & Co., Ernst & Whinney, as successor to S. D. Leidesdorf & Co., and individual partners in each ("the Accountants"). The Accountants served as IFC's independent auditors during the relevant years, and are alleged to have performed such services in derogation of accepted professional standards and to have favorably reported on misleading financial statements.

The alleged acts of the Banks and the Accountants are said to have violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, and to constitute common law fraud.

On December 8, 1980, this Court tentatively approved a settlement between the class action plaintiffs and the Banks, and notice of this proposed settlement was sent to purported class members.[2] On January 27, 1981, the Court preliminarily approved a settlement between the class action plaintiffs and the Accountants, and directed that appropriate notice be sent. A hearing regarding these proposed settlements was held on March 6, 1981, at the conclusion of which such settlements were given final approval by the Court.

## DISCUSSION

Approval of a settlement in a class action turns on whether the settlement is fair, reasonable and adequate from the standpoint of the absent class members. *E. g., West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1085 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). Accordingly, a court should consider:

(1) the strength of plaintiffs' case on the merits balanced against the amount offered in settlement;

(2) presence of collusion in reaching a settlement;

(3) the reaction of members of the class to the settlement;

(4) the opinion of competent counsel; and

(5) the stage of the proceedings and the amount of discovery completed. *Duban v. Diversified Mtg. Investors,* 87 F.R.D. 33, 38 (S.D.N.Y.1980). Consideration of these factors has impelled the Court to approve the instant settlements.

1. *Strength of Case Balanced Against Settlement*

Because of the intricate interrelationship of these settlements with the Plan of Reorganization involving IFC and the partial settlement of claims brought by the Trustee, the final product of the negotiations reflects an unusually complex and detailed arrangement. The terms of the settlements are capably "summarized" at pages 20–42 of the Affidavit of David J. Bershad in Support of Partial Settlement with Bank and Accounting Defendants, and a full restatement here is unnecessary. In this Opinion and Order, I shall venture only to

---

ants in the class actions, they are named as defendants in separate actions brought by the Reorganization Trustee of IFC. Because of the interrelationship of the class action settlements with settlements in the actions by the Trustee and with the Plan of Reorganization for IFC, these three entities are included in the settlements with the Banks in the class actions. "The Banks" also includes defendant Republic National Life Insurance Company for simplicity of reference, although that entity is manifestly not a bank.

2. That notice also advised that plaintiffs proposed to release from any potential liability six individual former officers of IFC—Louis Adler, Samuel Heller, Richard Loman, Stanley Rappoport, Leo Sheiner and Sydney Schneider—based upon written representations by such individuals as to their relatively insubstantial net worth and upon commitments by these defendants to cooperate with plaintiffs in the prosecution of these actions against non-settling defendants. These stipulations have also been approved by the Court following receipt of no objections thereto from class members.

convey the major features of the two settlement agreements.

Pursuant to the settlement with the Banks, $7,030,000, less an award of attorneys' fees and expenses, will be made available to purported class members. That fund will be distributed among three groups—shareholders, debenture-sellers (purchasers of IFC debentures who sold prior to the date when a proof of claim could have been filed) and debenture-holders (purchasers of debentures who have continued to hold through the date when a proof of claim may be filed). The distribution among the groups is based upon an assessment of the varying probability of success on the merits for each group, as well as the relative damages allegedly sustained by each group. As a result, a substantial majority of the funds—$5,600,000—has been allocated to debenture-holders. Additionally, under the agreements the costs of notice of the proposed settlement agreements and the processing of claims by class members, estimated at approximately $150,000, will be borne by the Reorganization Trustee.

Debenture-holders receive a further substantial benefit by virtue of the fact that the Banks have agreed to compromise their claims as senior creditors of IFC (and related entities) and, with the exception of Republic National Life Insurance Company, to release their liens as secured creditors. It is now anticipated that, under the Plan of Reorganization, debenture-holders will receive amounts equal to approximately 16% of the unpaid principal of their debentures, whereas the debenture-holders would likely have received no portion of these amounts if the Banks had successfully maintained their prior positions. When the funds that debenture-holders will receive directly from the Banks under the Bank settlements are included, it is estimated that debenture-holders will receive a total of 20% of the unpaid principal of their debentures (plus a share of any additional funds recovered from defendants other than the Banks).

In consideration for these substantial payments and concessions, the settlement agreement with the Banks provides that any recoveries *by debenture-holders* from any other defendants, less any award of attorneys' fees, shall be assigned to the Reorganization Trustee, to be distributed under the Plan of Reorganization in roughly equal shares to the Banks and the debenture-holders. Plaintiffs and the class members have also committed to indemnify the Banks for amounts recovered from the Banks by a non-settling defendant who is found liable to plaintiffs and the classes after a trial or other determination on the merits and who then successfully asserts a claim for contribution or indemnification against any of the Banks, but such indemnification by plaintiffs is limited to a maximum of 25% of the amount recovered by plaintiffs from such non-settling defendant. Settlements with any other defendants must also include covenants by such other defendants not to sue the Banks.

The settlement with the Accountants provides class members with an additional $1,300,000, less any amounts awarded as attorneys' fees. This amount is also allocated to shareholders, debenture-sellers and debenture-holders in accordance with the factors outlined above. Accordingly, $980,000, less attorneys' fees, is allocated to debenture-holders. Pursuant to the settlement with the Banks, this amount will be assigned to the Reorganization Trustee and the debenture-holders will ultimately receive approximately 50% thereof. The Accountants have also agreed to withdraw any claims they have asserted or could assert in the reorganization proceeding.

Certain provisions in the Banks' settlement appear in substantially identical form in the Accountants' settlement, including the provisions regarding indemnification, covenants not to sue, and the bearing of the costs of notice and the processing of claims by the Trustee. The Banks and the Accountants have executed covenants not to sue each other in accordance with these provisions.

The benefits to purported class members are thus substantial, especially when viewed as being in only partial satisfaction of the claims asserted in these actions. When

these advantages are balanced against the prospect of continued litigation, approval of these settlements appears to be the only proper course of action. Consideration of the following factors compels this conclusion:

(1) A review of the complaint reveals that the main actors in the scheme alleged to have led to the collapse of IFC are defendants other than the Banks and the Accountants. The gist of the allegations against the settling defendants is that they aided and abetted other defendants by failing to discover aspects of the frauds allegedly being perpetrated by such other defendants. Thus, the allegations against these defendants are such that proof of liability would be neither simple nor direct, but instead would require that a sequence of issues each be resolved in favor of plaintiffs, including the existence of primary violations by other defendants, the existence of, and failure to satisfy, obligations by the settling defendants to discover and disclose elements of such primary violations, and proof of scienter where required.

(2) Proof that damages were causally related to the acts complained of would undoubtedly be hotly contested. The possibility that plaintiffs could succeed in establishing the liability of the Banks and the Accountants and yet obtain damage awards not substantially exceeding the amounts to be received under these settlements is very real.

(3) The Banks have filed motions to dismiss in three of the five class actions, and Magistrate Harold J. Raby, to whom the motions were referred, has recommended the granting of such motions. The motions were *sub judice* when the settlement with the Banks was reached.

(4) The Accountants have filed motions to dismiss in all five of the class actions and the Court has ruled in favor of the Accountants on substantial aspects of these motions. Plaintiffs have filed motions to reargue and to intervene (seeking to cure a

defect resulting from the limited standing of the named plaintiffs in the *Morse* action), which motions were pending when the settlement with the Accountants was reached.

(5) Because of the interrelationship of these settlements and the Plan of Reorganization, each has been made contingent upon the approval of the other. For reasons that need not be detailed here, certain outside contributors to the Plan of Reorganization have effectively conditioned their participation in the Plan upon its final approval before a specified date, and the present settlements have incorporated corresponding time limitations. Consequently, were the Court to disapprove these settlements, not only would class members have been subjected to the delays and expenses of continued pretrial practice, but such action by the Court would quite possibly have forfeited the class members' sole opportunity to resolve these claims against the Banks and the Accountants short of a much more expensive trial with uncertain results.

### 2. Collusion

There is every indication that these settlements are the result of painstaking, arm's-length bargaining. The standing of counsel in the legal community, the history of the negotiations, the detail and complexity of the settlement agreements and the entire conduct of these litigations impel that conclusion.

### 3. Reaction of Class Members

Over 50,000 notices were sent to purported class members regarding the Banks' settlement and a similar mailing was made regarding the Accountants' settlement. In neither case was a single objection filed, and no objection to the settlements was raised at the hearing.[3]

### 4. Recommendation of Counsel

Plaintiffs' attorneys' experience and competence are demonstrated and unchal-

---

**3.** There was one objection as to the definition of "Authorized Claimant"; *i. e.*, a class member entitled to file a proof of claim. That objection was not to the fairness of the settlements as such, but simply a premature objection to an anticipated denial of a proof of claim.

lenged. Their opinion that the settlement agreement is in the best interests of the class members is entitled to, and has been accorded, significant weight by the Court in approving the settlements.

### 5. *Stage of Proceedings*

These settlements come after several years of extensive pretrial discovery by plaintiffs' attorneys and the Reorganization Trustee. Plainly, plaintiffs were "truly in a position to analyze objectively the strength of [their] case on the merits, and to balance that strength against the amount offered in settlement and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Stull v. Baker*, 410 F.Supp. 1326, 1333 (S.D.N.Y.1976).

### ATTORNEYS' FEES

Plaintiffs' counsel[4] seek attorneys' fees in the amount of $890,000,[5] plus expenses and disbursements in the amount of $184,500. That total of $1,074,500 would come from the following sources:

$680,000—from a fund in that amount specifically established pursuant to the Banks' settlement for the payment of fees and expense relating to the settlement on behalf of debenture-holders and debenture-sellers.

$32,500—from the $150,000 fund created for stockholders pursuant to the Banks' settlement.

$362,000—from the $1,300,000 fund created pursuant to the Accountants' settlement, allocated pro rata among the three portions of this fund set aside for the shareholders, debenture-holders and debenture-sellers.

The Court has determined to award counsel fees and expenses in the amount and manner requested.

The seminal cases in this Circuit on the subject of attorneys' fees are *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d

Cir. 1974) ("*Grinnell I*"), and *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir. 1977) ("*Grinnell II*"). Under *Grinnell I* and *Grinnell II*, the starting point in determining an award of attorneys' fees is the amount of time spent in prosecution of the action and the hourly rates normally charged therefor. The product of multiplying the number of hours by the hourly rate constitutes a base or "lodestar" figure which is then adjusted in accordance with "less objective factors." *Grinnell I, supra*, 495 F.2d at 471; *Grinnell II, supra*, 560 F.2d at 1098. Among the latter factors are "the magnitude and complexity of the litigation, the amount recovered and litigation risks." *FLM Collision Parts, Inc. v. Ford Motor Co.*, 411 F.Supp. 627, 632 (S.D.N.Y.), *aff'd in part and rev'd in other part on other grounds*, 543 F.2d 1019 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); see also *Williams v. Schatz Mfg. Co.*, 449 F.Supp. 147 (S.D.N.Y. 1977).

Plaintiffs' counsel have submitted comprehensive affidavits in support of their fee application which detail expenses and disbursements totaling $192,053.97 (or $7,553.97 in excess of counsel's request for reimbursement). Counsel's time charges total $846,560.25 for 7,647.5 hours, or an average hourly rate of just in excess of $110, reflecting in part the commendable use of paralegals and associates where appropriate.

Plaintiffs' counsel's request for a fee award of $890,000 represents an increase of approximately 5% over normal hourly charges. In view of the facts

(1) that these actions are manifestly complex, requiring counsel to handle the many organizational and strategic problems inherent in a multidistrict litigation of this size,

(2) that counsel have coordinated their efforts to avoid duplicative charges,

---

**4.** Milberg Weiss Bershad & Specthrie; Lawrence Soicher, Esq.; Wolf Haldenstein Adler Freeman & Herz; Crystal & Driscoll, P. C.; Pincus Munzer Bizar & D'Allesandro.

**5.** Plaintiffs' counsel also requests that $330,000 of the fee award earn interest from the date of the escrow deposit as provided in the Banks' settlement.

(3) that counsel have been employed on contingency bases and have assumed the substantial risks attendant to the prosecution of plaintiffs' claims,

(4) that in the Court's view these settlements represent favorable recoveries for the class members under all the circumstances existing at this time, and

(5) that counsel's fee request represents less than 11% of the total settlement funds of $8,330,000, well within the range of acceptable fee awards in cases such as these,

the Court concludes that counsel are entitled to the modest requested increase above the "lodestar" figure. Counsel are hereby awarded fees in the amount of $890,000 and reimbursement for expenses and disbursements in the amount of $184,500, for a total of $1,074,500, such an amount to be provided from the sources and in the manner specified herein and in the affidavits of plaintiffs' counsel.

SO ORDERED.